604 A.2d 473

## MOTOR VEHICLE ADMINISTRATION OF THE MARYLAND DEPARTMENT OF TRANSPORTATION

v.

## SEIDEL CHEVROLET, INC.

No. 45, Sept. Term, 1991.

Court of Appeals of Maryland.

April 10, 1992.

238

Lawrence H. Norton, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Risselle Rosenthal Fleisher, Asst. Atty. Gen., all on brief), Glen Burnie, for petitioner/cross respondent.

Josel W. Shoap (Robert H. Law, both on brief), Bowie, for respondent/cross petitioner.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

In this case we focus on Maryland Code (1977, 1987 Repl.Vol.), §§ 13–209 and 13–210 of the Transportation Article which establish an Assurance Fund ("Fund") within the Motor Vehicle Administration ("MVA") to compensate "any interested person [who] has sustained [a] loss or damage" due to "an omission or error in the filing, recording, or indexing of a security interest ... made by an employee of [MVA] in the course of employment." The principal question in the case is whether, and if so how much, the respondent/cross-petitioner, Seidel Chevrolet, Inc. ("Seidel") is entitled to recover from the Fund. In answering this question we must decide the related issues of: 1) whether the Legislature intended to restrict a claimant's compensable loss under the Fund to "net loss," and 2) does the "collateral source rule" apply to damage or loss claims filed against the Fund. The case arose from MVA's errors in connection with the issuance to one William Osborne James ("James") of a duplicate title to an automobile. The facts are undisputed.

### I.

On August 22, 1986, James purchased a 1983 Mercedes Benz from Euro Motorcars Bethesda, Inc. The purchase was financed, in part, by Loyola Federal Savings and Loan Association ("Loyola"), which placed a lien on the car in the amount of $27,374.84. On August 29, 1986, MVA issued a Certificate of Title for the Mercedes to James which noted the lien held by Loyola. MVA also sent a Notice of Security Interest Filing to Loyola certifying that a security interest had been filed with MVA in favor of Loyola on the Mercedes.

In November of 1986, James went to the Largo Branch Office of the MVA and presented the Certificate of Title for his Mercedes together with a fraudulently executed Security Interest Termination Statement with reference to Loyola's lien. Upon receipt of the Termination Statement, a member of the Largo Branch Office staff telephoned the Central Lien Section at MVA Headquarters and obtained approval to release the lien held by Loyola. A clerk at the Largo Branch Office stamped the vehicle title indicating that the lien on the Mercedes had been satisfied. This transaction was recorded on a daily log at the Central Lien Section.

According to MVA standard operating procedures, Termination Statements received at a branch office are to be forwarded immediately to the Central Lien Section for inclusion in the central titling records. If the Termination Statement releasing the lien is not received by the Central Lien Section within a week, specified search procedures, including communication with the actual lienholder, are implemented. Although James's Termination Statement was mailed to the Central Lien Section, it was not received. In addition, the prescribed search procedures to locate the statement were never implemented at the Central Lien Section.

On January 13, 1987, James took the Mercedes title to MVA's headquarters in Glen Burnie where he submitted it,

along with an application for a duplicate title attesting that his Certificate of Title had been "misassigned" and certifying there was no existing lien on the vehicle. The "misassigned" title presented to the MVA employee bore the stamp and initial of a clerk from the Largo Branch Office indicating release of the lien. At this point, MVA standard operating procedures required that MVA staff search its titling records to match the information contained in James's application with the master records for lien releases. This task was either not done or the search was incorrectly performed, since there was no document in the file confirming the release of the lien on James's Mercedes. Nevertheless, MVA issued to James a duplicate title showing that the car was free of any lien.

Ten days later, James took the duplicate title along with the Mercedes to Seidel, where he exchanged the Mercedes for a new 1987 Chevrolet Blazer and a check for $5,972.45. James also signed an "Acknowledgement of Clear Title on Trade-in Vehicles" wherein he warranted that there was no outstanding lien on the Mercedes. On March 30, 1987, Seidel sold the Mercedes to a Shirley Christopher for $19,995.00. At the time of the sale, Seidel delivered the duplicate title and possession of the Mercedes to Christopher in exchange for a down payment of $1,500.00 in cash and a trade-in Chevrolet valued at $4,000.00. The balance of the sale price was to be financed by General Motors Acceptance Corporation.[1]

On May 12, 1987, Loyola repossessed the Mercedes from Christopher because James failed to make his required loan payments. As a result of the repossession, Christopher filed a complaint with the MVA against Seidel. Christopher's complaint was investigated by MVA's Licensing and Consumer Services Department, and on June 29, 1987, a

---

1. Seidel did not receive any money in connection with the financed portion of the transaction because the contract was subsequently cancelled by GMAC on the grounds that the Mercedes was encumbered by the lien held by Loyola.

report was filed which concluded that there was 1) "no evidence that the dealer was at fault," and 2) "no apparent violation of Maryland Vehicle Law." The report also recommended that the "investigation be considered closed."

Unsatisfied with the results of the investigation, Christopher filed a civil suit against Seidel in the District Court of Maryland, sitting in Prince George's County. That case was eventually settled, by Seidel paying Christopher the sum of $6,500.00. Seidel's insurance carrier reimbursed Seidel $1,250.00 of the settlement amount.

The facts and circumstances surrounding the James and Christopher transactions also gave rise to a civil action and criminal prosecution against James. In the civil case, Seidel sued James in the Circuit Court for Prince George's County for breach of contract and fraud. This case was ultimately dismissed on June 27, 1991 for lack of prosecution pursuant to Maryland Rule 2–507. In the criminal case James was charged in the District Court of Maryland, sitting in Prince George's County, with theft of over $300.00 in violation of Md.Code (1957, 1987 Repl.Vol.), Art. 27, § 342. James prayed a jury trial and the case was transferred to the Circuit Court for Prince George's County. There, he plead guilty to theft. The court suspended the sentence it imposed upon James, placed him on probation, and ordered him to pay $20,000.00 in restitution to Seidel.[2]

Seidel also moved to recoup its losses outside of the courts. First, it filed a claim with its insurance carrier based on its transaction with James, and was paid $21,-768.93. Then, in June of 1988, Seidel paid Loyola $10,000.00 in exchange for a lien-free title to and possession of the Mercedes. Soon thereafter, Seidel resold the car for $16,-000.00. Finally, on June 9, 1988, Seidel filed a claim with the MVA against the Fund. Seidel alleged that it had "... sustained a loss in excess of $30,000.00 ..." as a result of

---

2. To date, James has failed or refused to pay any restitution to Seidel.

MVA's errors in issuing the duplicate title to James for the Mercedes.

## II.

In accordance with § 13–210(b) of the Transportation Article a hearing on Seidel's claim against the Fund was held before an administrative law judge ("ALJ"). All of the facts in the case were reduced to stipulation except for the receipt by Seidel of payments from its insurance carriers in connection with the James transaction. Evidence concerning these insurance payments was admitted at the hearing, however, over Seidel's objections.

Pursuant to Md.Regs.Code, (COMAR) tit. 11, § 11.02.-08B(1) (1989), the ALJ made Findings of Fact, Proposed Conclusions of Law, and Recommendations. The ALJ found that MVA's errors in connection with the issuance and processing of James's duplicate title resulted in "loss or damage" to Seidel, and therefore, Seidel was entitled to collect from the Fund. In determining the amount of Seidel's "loss or damage," the ALJ subtracted the sums paid to Seidel by its insurance carriers. In addition, the ALJ included as part of his calculation of Seidel's loss, attorney's fees expended by Seidel in its effort to make up for its losses. His calculation of the damages was as follows:

| | | |
|---|---|---:|
| "Cost of 1987 Blazer | | $15,584.72 |
| Amount paid by Seidel to James | – | 5,972.45 |
| Settlement of Christopher | – | 6,500.00 |
| Attorney's fees incurred by Seidel | – | 4,031.25 |
| Subtotal: Sustained Loss | | $32,088.42 |
| Payment of Christopher to Seidel | + | $ 1,500.00 |
| Trade-in of Chevy to Seidel | + | 4,000.00 |
| Payment from Insurer | + | 21,768.93 |
| Payment from Insurer | + | 1,250.00 |
| Subtotal: Prior Recovery | + | $28,518.93 |
| **NET LOSS** | = | $ 3,569.49" |

After considering the ALJ's Findings of Fact, Proposed Conclusions of Law, and Recommendations, the Administrator of the MVA modified the ALJ's recommendations. The Administrator concluded that "the attorneys' fees incurred by the claimant in the amount of $4,031.25 [we]re not damages for which the Assurance Fund [wa]s liable," and therefore, "the Assurance Fund [wa]s not to pay [Seidel] any monies as a result of the claim filed with [MVA]."

Seidel appealed the Administrator's decision to the Circuit Court for Prince George's County pursuant to § 13–210(c) of the Transportation Article. The circuit court ruled that the money collected by Seidel from its insurance carriers should not have been deducted in the calculating of Seidel's loss and ordered the MVA to pay Seidel $10,000.00. The lower court reasoned that "[i]f the legislative body meant to exclude the collateral source rule from this type of statute, [it] had more than ample opportunity to do so. [However,] they have not done so." In determining that the amount to be paid to Seidel was $10,000.00, the circuit court ruled that, although the security interest of Loyola resulting from the transaction between James and Euro Motorcars Bethesda, Inc. was $27,374.84, the security interest to which Seidel's claim against the Fund related was the $10,000.00 Seidel paid to Loyola to buy Loyola's interest in the Mercedes. The circuit court also upheld the Administrator's decision not to award attorneys' fees.

Discontented with the circuit court's decision, MVA filed a petition for the issuance of a writ of certiorari asking this Court to determine:

> "[Whether] the circuit court err[ed] when it ruled, in the context of a claim against the [MVA's] Assurance Fund for losses incurred as a result of the agency's handling of a security interest filing, that [Seidel] should be paid *twice*—once by [Seidel's] insurance carrier and again by the Fund."

Seidel filed a cross-petition. It asked us to decide the following questions:

1.  Did the circuit court err when it ruled, in the context of a claim against the [MVA] Assurance Fund that a claimant's attorney's fees are not a loss compensable under the Assurance Fund?
2.  Did the circuit court err when it ruled, in the context of a claim against the [MVA] Assurance Fund that the amount of the security interest to which the claim related was $10,000.00?
3.  Whether the question of the Assurance Fund's exemption from liability was not cognizable on appeal?

We granted both petitions.

### III.

The question of whether, and if so how much, Seidel is entitled to recover from the Fund is essentially an issue of statutory construction. The statutes at issue are §§ 13–209 and 13–210 of the Transportation Article.[3] Section 13–209 establishes a duty within the MVA to create an Assurance Fund:

> "(a) *Deposit of fees.*—The Administration shall maintain an Assurance Fund and deposit in it that part of the filing fees collected under this subtitle that is not credited to any special funds under § 13–208 of this subtitle.
>
> (b) *Transfer of excess sums.*—When the Assurance Fund reaches $25,000, any money in excess of that amount shall be transferred to and form part of the Gasoline and Motor Vehicle Revenue Account of the Transportation Trust Fund. (An.Code 1957, art. 66½, § 3–209; 1977, ch. 14, § 2.)"

Sections 13–210(a), (b), and (c) set forth the criteria for a valid claim against the Fund and outline the procedures under which a claim against the Fund will be considered and paid:

> "(a) *How and by whom permitted; limitations.*—(1) If an omission or error in the filing, recording, or index-

---

**3.** Both parties assume that Seidel was authorized under these statutes to recover from the Fund, and we proceed on that assumption.

ing of a security interest has been made by an employee of the Administration in the course of employment and, as a result of the omission or error, any interested person has sustained loss or damage, the person may file a claim with the Administration for payment of the loss or damage out of the Assurance Fund maintained under § 13–209 of this subtitle. The claim for payment shall include a request for a hearing on the matter and shall be made in the manner and on the form that the Administration requires.

(2) A claim for payment under this section may not be made unless it is filed with the Administration within 3 years from the date the cause of action arose.

(b) *Determination by Administration.*—After notice to all interested parties and a hearing on the claim, the Administration may:

(1) Order that any loss or damage sustained by the claimant be paid out of the Assurance Fund, subject to the limitations set forth in this section; or

(2) Order that the claim be dismissed and deny payment of the claim.

(c) *Judicial Review of determination.*—(1) Any aggrieved party to a hearing under this section may appeal from the decision of the Administration as follows:

(i) To the circuit court for the county in which the party resides or has his principal place of business; or

(ii) If the party does not reside or have a principal place of business in this State, to the Circuit Court for Anne Arundel County.

(2) The circuit court to which an appeal is made under this section has jurisdiction to examine the facts of the case and to determine if the claimant is entitled under this section to recover for any loss or damage. The Administration shall pay the amount of any judgment recovered against the Assurance Fund up to the amount of the security interest to which the claim relates."

Section 13–210(d) delineates the circumstances under which the Fund is not liable:

"(d) *When Fund exempt from liability.*—The Assurance Fund is not liable under any circumstances for:

(1) Any loss or damage that exceeds the amount of the security interest to which the claim relates; or

(2) Any loss or damage that results from:

(i) The claimant's breach of any trust, whether expressed, implied, or constructive;

(ii) The improper use of the seal of any corporation to deal with the property or interest involved or to execute or take the benefit of the instrument recorded; or

(iii) The recording of an instrument executed by a person under legal disability, unless the fact of the disability is disclosed on the instrument."

Finally, subsection (e) provides for:

"(e) *Liability of claimant for costs.*—If, in an appeal against the Administration, judgment is given in favor of the Administration or the appeal is dismissed at the request of the claimant, the claimant shall pay the full costs of the appeal. (An.Code 1957, art. 66½, § 3–209; 1977, ch. 14, § 2; 1982, ch. 820, § 3.)"

In this court, MVA's sole contention is that the Circuit Court misconstrued the Legislature's intent in enacting §§ 13–209 and 13–210 of the Transportation Article by applying the collateral source rule to its determination of whether Seidel should be compensated from the Fund. MVA argues that "the Fund's stated purpose, its manner of administration, its legislative history, and its limited resources all suggest a self-contained remedy [designed to compensate only the] net loss incurred by a party injured by MVA's mistake." It claims that the collateral source rule is inconsistent with the statutory scheme set forth in §§ 13–209 and 13–210 because the collateral source rule is a principle applied exclusively in tort cases while §§ 13–209 and 13–210 are components of an administrative scheme designed to provide a benefit under a certain set of circumstances.

On the other hand, Seidel argues that the collateral source rule applies to any claim for loss or damage filed with the Fund. It contends that the phrase "loss or damage" set forth in 13–210(a) is clear and unambiguous on its face, and, therefore, should be construed according to its natural import. Seidel maintains that, since there is nothing in the statute which expressly states, or by inference refers to "net loss," the legislature did not intend to restrict a claimant's compensable loss under the Fund to net loss. Seidel also points to this Court's adoption of the Restatement (Second) of Torts § 920A(2) (1979) in *Levi v. Schwartz,* 201 Md. 575, 95 A.2d 322 (1952), which states:

> "Payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable."

## IV.

██ We have stated time and time again that the cardinal rule of statutory construction is to ascertain and effectuate legislative intent. *Weidig v. Crites,* 323 Md. 408, 411, 593 A.2d 1094, 1095 (1991); *Mustafa v. State,* 323 Md. 65, 73, 591 A.2d 481, 485 (1991); *Taxiera v. Malkus,* 320 Md. 471, 480, 578 A.2d 761, 765 (1990); *Harford County v. University,* 318 Md. 525, 529, 569 A.2d 649, 651 (1990); *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471, 474 (1988); *Mazor v. State Dep't of Correction,* 279 Md. 355, 361, 369 A.2d 82, 87 (1977). In our quest to divine the Legislature's intent, we have also explained:

> "There is no doubt that the beginning point of statutory construction is the language of the statute itself. Obviously, ' "what the legislature has written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal." ' When we look at the statutory language, we attempt to give effect to all the words in the statute. And sometimes it may not be necessary to go further than the scrutiny of statutory language, for

the language itself may be sufficiently expressive of the legislative purpose or goal.

But our endeavor is always to seek out the legislative purpose, the general aim or policy, the ends to be accomplished, the evils to be redressed by a particular enactment. In the conduct of that enterprise, we are not limited to study of the statutory language. The plain meaning rule ' "is not a complete, all-sufficient rule for ascertaining a legislative intention. . . ." ' The 'meaning of the plainest language' is controlled by the context in which it appears. Thus, we always are free to look at the context within which statutory language appears. Even when the words of a statute carry a definite meaning, we are not 'precluded from consulting legislative history as part of the process of determining the legislative purpose or goal' of the law."

*Morris v. Prince George's County,* 319 Md. 597, 603–04, 573 A.2d 1346, 1349 (1990) (citations and footnote omitted).

■ Applying these principles to the case *sub judice,* we turn first to the statutory language which controls the fate of Seidel's claim against the Fund: "If an omission or error in the filing, recording, or indexing of a security interest has been made by an employee of the Administration in the course of employment, and, as a result of the omission or error, any interested person has sustained loss or damage, the person may file a claim with the Administration for the loss or damage out of the Assurance Fund. . . ." The critical words are "loss or damage." We believe that the meaning behind those words is subject to more than one interpretation. Since neither term is expressly defined in § 13–210, we look to the legislative history of §§ 13–209 and 13–210 for guidance.

Sections 13–209 and 13–210 were first enacted by Ch. 398 of the Acts of 1971 and codified as Md.Code (1957, 1970 Repl.Vol., 1971 Cum.Supp.), Art. 66½, § 3–209. At that time, the General Assembly expressly provided that a person filing a claim against the Fund could only do so if that claimant was barred from maintaining an action against any

other person for the recovery of the loss or damage sought from the Fund. The pertinent language of Art. 66½, § 3–209(c) stated:

> "Any person sustaining loss or damage through an omission, mistake, or error of any employee of the Department in the execution of his duties and *who by the operation of that act is barred from maintaining an action against any other person for the recovery of his loss or damage,* may bring an action for damages against the Department...."

(emphasis added). In light of such limiting language, we believe that it is beyond cavil that the Legislature intended that the Fund should only compensate those claimants who could not otherwise recover. Any other construction would be contrary to the language and general purpose of the statute.

Art. 66½, § 3–209 was amended by Ch. 312 of the Acts of 1975. Those amendments, *inter alia,* replaced the former language of subsection (c) with new language granting MVA the authority to determine after a hearing whether a claimant was entitled to recover from the fund. The new language removed the qualifying language of the former subsection (c) regarding persons "... barred from maintaining an action against any other person ..." and in its place provided:

> "If the Administration determines after a hearing, following notice to all interested parties, that an omission, mistake, or error has been made by an employee of the Administration in the course of employment and as a result of the error any interested person has sustained a loss or damage, it shall order that payment of loss or damage be made, or, in the alternative, shall order denial of payment of loss or damage. No request for hearing for damages or loss under this section may be brought against the Administration unless it is brought within three years from the date the cause of action arose."

Md.Code (1970 Repl.Vol., 1976 Cum.Supp.), Art. 66½, § 3–209(c)(1).[4]

Although the qualifying language set forth in the original enactment of the statute creating the Fund was stricken by the 1975 amendments, we reject Seidel's argument that the omission of such language was intended to effect a substantive change in the meaning of the phrase "loss or damage." We reach that conclusion for two reasons.

First, the purpose clause of Ch. 312 of the Acts of 1975 reveals that the primary purposes of the amendments were threefold: 1) to eliminate the recordation taxes paid on liens for motor vehicles; 2) to create a special fund for accumulation and distribution of fees collected to certain counties; and 3) to clarify the hearing procedures for claims against the Fund.[5] There are no references in the purpose clause indicating any intent to change or alter the meaning of

---

**4.** The 1975 amendments also provided for judicial review of the MVA's decision. Subsection 3–209(c)(2) stated:

"Any person who contests the decision of the Motor Vehicle Administration after a hearing may file an appeal for a hearing in the matter in the Baltimore City Court or in the circuit court of the county, as the case may be, where the person resides. The court is vested with the jurisdiction to examine into the facts of the case and to determine if the petitioner is entitled to recover for the loss or damage. In cases where jurisdiction is not otherwise provided for in this section, the Circuit Court for Anne Arundel County shall have jurisdiction."

**5.** The text of the purpose clause accompanying the 1975 amendments read:

"For the purpose of eliminating the recordation tax on written lien instruments and creating a special fund for accumulation and distribution to the several counties and Baltimore City of a portion of the fee collected for filing a security interest with the Motor Vehicle Administration; eliminating the requirement necessitating the payment of the recordation tax in addition to filing a security interest with the Motor Vehicle Administration as a condition to perfecting a security interest; clarifying the hearing procedures for action for damages for any person sustaining a loss or damage resulting from an omission or mistake, or error in the proper filing and recording of a security interest by an employee of the Motor Vehicle Administration in the execution of his duties; and clarifying language."
Ch. 312 of the Laws of 1975.

"loss or damage," or to liberalize the original restrictions pertaining to potential claimants.

Second, the Revised Fiscal Note on Senate Bill 304, which became Ch. 312 of the Acts of 1975, supports our view that the 1975 amendments were not intended to change the original meaning of "loss or damage." It states that "[t]here would be no significant fiscal impact on the administrative expenses of the [MVA] or the Office of the Comptroller to implement this legislation...." The discussion in the Note deals exclusively with the fiscal impact of the elimination of the recordation tax and the creation of increased filing fees, and there are no references in the Note regarding the significant fiscal impact which would undoubtedly result if the Legislature had intended to broaden the pool of potential claimants against the Fund. Finally, the General Assembly did not increase the original cap on the revolving fund of $25,000.00. Therefore, we believe that it would be illogical and inconsistent with common sense to interpret the omission of the qualifying language in the 1975 amendments to Art. 66½, § 3–209 as changing the Legislature's original intent that the Fund should only compensate those claimants who could not otherwise recover for the loss or damage suffered because of MVA error. *Harford County, supra,* 318 Md. at 529–30, 569 A.2d at 651; *Potter v. Bethesda Fire Dep't,* 309 Md. 347, 353, 524 A.2d 61, 64 (1987).

The last amendments to the statute which is now codified as §§ 13–209 and 13–210 of the Transportation Article occurred in 1977 when the Legislature recodified Md.Code (1970 Repl.Vol., 1976 Cum.Supp.) Art. 66½, § 3–209 as Md.Code (1977), §§ 13–209 and 13–210 of the Transportation Article.[6] Although the recodification subdivided former Art. 66½, § 3–209 into two sections of the Transportation Article and added some new language, the Revisor's Notes accompanying these recodified sections expressly declared

---

6. Ch. 14 of the Acts of 1977.

that "[it was] new language derived without substantial change from Art. 66½, § 3–209(c) through (f)."

Therefore, viewing the legislative history of §§ 13–209 and 13–210 as a whole, we conclude that legislative intent for the creation of the Fund has always been to provide a source of compensation to those parties who have suffered loss or damage, who have no other source available. Accordingly, we hold that the Legislature intended the interested party's loss or damage compensable from the Fund to be restricted to the party's net loss.

## V.

By construing §§ 13–209 and 13–210 of the Transportation Article as we have in Part IV of this opinion, we reject Seidel's argument that the collateral source rule should be applied to its claim against the Fund. We explain that rejection.

Since 1899,[7] the collateral source rule has been applied in this State to permit an injured person to recover in tort the full amount of his provable damages regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor. Nevertheless, where the question has arisen, most courts have restricted application of the rule to tort litigation; E.g., *Dennison v. Head Constr. Co.*, 54 Md.App. 310, 319–322, 458 A.2d 868, 873–75 (1983) (workers' compensation case); *U.S. v. City of Twin Falls, Idaho*, 806 F.2d 862, 873–74 (9th Cir.1986), *cert. denied*, 482 U.S. 914, 107 S.Ct. 3185, 96 L.Ed.2d 674 (1987) (contract action); *Daniel Constr. Co. v. International Union of Operating Engineers, Local 513*, 570 F.Supp. 299, 303 (E.D.Mo.1983), *aff'd on other grounds*, 738 F.2d 296 (8th Cir.1984) (contract action); *Hub-*

---

**7.** *See City Pass. Ry. Co. v. Baer*, 90 Md. 97, 44 A. 992 (1899) (holding, in a suit for injuries sustained while attempting to board a trolley car, that sick benefits received by plaintiff from any source other than from defendant were not to be considered by jury in arriving at their verdict).

*bard Broadcasting, Inc. v. Loescher,* 291 N.W.2d 216, 222–23 (Minn.1980) (suit on injunction bond); *Grover v. Ratliff,* 120 Ariz. 368, 586 P.2d 213, 215 (App.1978) (contract action).

The scope of the application of the collateral source rule and the argument most frequently advanced in justification for the rule appear in the *Restatement (Second) of Torts,* § 920A(2), comment b (1977):

"Payments made or benefits conferred by other sources are known as collateral-source benefits. They do not have the effect of reducing the recovery against the defendant. The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury. But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him."

In the instant case, MVA contends that the circuit court erred in applying the collateral source rule to Seidel's claim against the Fund. It argues that the Legislature did not intend that claims against the Fund be treated in the same manner as a tort claim, but, rather, as a self-contained administrative scheme to compensate the actual net loss incurred by a party injured by MVA's error or omission. While MVA acknowledges that there are various public policies used to justify the collateral source rule, it maintains that the overriding emphasis is on punishing, or placing the burden on, the tort-feasor as a wrongdoer. As such, MVA argues that "it is inconceivable that the Legisla-

ture intended to punish or burden the State financially rather than compensate, [or] make whole the person prejudiced by [MVA] error."

In reply, Seidel argues that the General Assembly in creating the Fund has waived the State's sovereign tort immunity with regard to errors and omissions by employees of the MVA in the course of filing, recording or indexing of security interests. It asserts that since the insurance benefits it received from its carriers in the wake of the James and Christopher transactions were the result of separate, independent contracts, the circuit court was correct in ruling that the collateral source rule applied to its claim against the Fund. We believe that MVA's characterization more accurately reflects the Legislature's intent in establishing the Fund.

We do not interpret §§ 13–209 and 13–210 of the Transportation Article as a waiver of the State's tort immunity. These statutes do not authorize suits for damages, nor do they it provide for the payment of judgments. *Kee v. State Highway Admin.,* 313 Md. 445, 455, 545 A.2d 1312, 1317 (1988).[8] Furthermore, recovery from the Fund is not predicated on tortious conduct by an MVA employee, and a

---

**8.** In *Kee v. State Highway Admin.,* we observed:

"A waiver of sovereign or governmental immunity from suit generally requires that two conditions be met. First, the Legislature must authorize suits for damages, and second, there must be provision for the payment of judgments. *See, generally, e.g., Md.-Nat'l Cap. P. & P. Comm'n v. Kranz,* 308 Md. 618, 623–626, 521 A.2d 729, 732–733 (1987); *Jackson v. Housing Opp. Comm'n,* 289 Md. 118, 123, 422 A.2d 376, 378–379 (1980); *Katz v. Washington Sub. San. Comm'n,* 284 Md. 503, 508–509, 397 A.2d 1027, 1030 (1979); *Board v. John K. Ruff, Inc.,* 278 Md. 580, 595, 366 A.2d 360, 363 (1976); *American Structures v. City of Balto.,* 278 Md. 356, 359, 364 A.2d 55, 56–57 (1976), and cases there cited; *Lohr v. River Commission,* 180 Md. 584, 26 A.2d 547 (1942); *University of Maryland v. Maas,* 173 Md. 554, 558–559, 197 A. 123, 125 (1937); *Fisher & Carozza Co. v. Mackall,* 138 Md. 586, 593–594, 114 A. 580, 583 (1921); *State v. Rich,* 126 Md. 643, 646–648, 95 A. 956, 957–958 (1915); *Weddle v. School Commissioners,* 94 Md. 334, 344–345, 51 A. 289, 291 (1902)."
313 Md. at 455–56, 545 A.2d at 1317–18.

claimant need not establish that MVA owed it a duty of care.

In addition to our belief that the Legislature never intended a claim against the Fund to be the equivalent of an action sounding in tort, we are convinced that the overriding policy reasons for invoking the collateral source rule—i.e. the desire to punish, or at least place the burden on, the tort-feasor for the harm caused—are not embodied in the administrative scheme set forth in §§ 13–209 and 13–210. Recovery from the Fund does not come from the pockets of the wrongdoer, but, instead, from the filing fees for titles and registrations paid by Maryland motor vehicle operators. As such, the rationale for the collateral source rule is inconsistent with the compensatory purposes evidenced by the General Assembly in creating the Fund.

## VI.

In light of our holding on the question presented by MVA's petition for certiorari, the second question presented by Seidel's cross-petition for certiorari is now moot. The remaining questions in Seidel's cross-petition are that: 1) the circuit court erred in ruling its attorney's fees are not a compensable loss recoverable from the Fund; and 2) the question of the Fund's exemption from liability was not cognizable on appeal. Although these issues were properly raised by Seidel in its cross-petition, they were neither briefed nor argued by Seidel before this Court. As such, we deem these issues waived. Maryland Rule 8–504(c); *Ricker v. Abrams*, 263 Md. 509, 516, 283 A.2d 583, 587 (1971), and cases cited therein.

JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY WITH INSTRUCTIONS TO AFFIRM THE ORDER OF THE MOTOR VEHICLE ADMINISTRATION; COSTS TO BE PAID BY RESPONDENT AND CROSS-PETITIONER.