739 A.2d 905

**Frederick W. PIQUETTE**

v.

**Seth Herman STEVENS, et al.**

**No. 5066, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Oct. 28, 1999.

592

594

William M. Ferris and Barbara J. Palmer (Lynn T. Krause and Krause & Ferris, on the brief), Annapolis, for appellant.

Rodger O. Robertson (Law Office of Joseph Jagielski, on the brief), Baltimore, for appellee.

Argued before WENNER, HOLLANDER and SALMON, JJ.

WENNER, Judge.

The genesis of this appeal is a judgment entered by the Circuit Court for Anne Arundel County in favor of appellee/cross-appellant, Seth Herman Stevens (Stevens). Appellant/cross-appellee is Frederick W. Piquette (Piquette). On appeal, Piquette presents us with the following questions, which we have rephrased for clarity: [1]

 I. As a matter of law, does a bicyclist who fails to come to a complete stop at a stop sign while attempting to make a right turn onto the boulevard, assume the risk of being struck by a vehicle making a left turn off of the boulevard?

 II. Is it an abuse of discretion for a trial judge to rule that plaintiff assumed the risk as a matter of law after

---

1. Appellant's questions were originally phrased as follows:

 I. Does a bicyclist, as a matter of law, assume the risk of being hit by a truck which is traveling in an opposing direction on the wrong side of the road simply by failing to come to a complete stop, while looking in both directions, at a stop sign shortly before the truck strikes the bicycle, where the bicyclist, after the rolling stop, is at all times proceeding in a lawful fashion on the proper side of the road onto which he or she turned after that rolling stop?

 II. Is it an abuse of discretion for a trial judge to reverse his or her ruling, prior to the case going to the jury, that the conduct described in the first question presented above did not constitute assumption of risk as a matter of law, simply because the jury did not find that Appellant assumed the risk and the judge was upset at the amount of the jury's verdict?

 III. On the facts of this case, where the two doctrines overlap to the point where there is no difference between them, can a trial judge rule that Appellant is not guilty of contributory negligence as a matter of law and simultaneously hold that Appellant assumed the risk without committing reversible error?

 IV. Is it an abuse of discretion for a trial judge, based on vaguely defined conduct of counsel or conduct of the jury not reflected in the record, to order a new trial simply because, had he or she been on the jury, he or she would have returned a different or lesser verdict?

the jury had returned a verdict that plaintiff had not assumed the risk?

III. Is it reversible error to rule that plaintiff assumed the risk as a matter of law while simultaneously ruling that plaintiff was not contributorily negligent as a matter of law?

IV. Is it an abuse of discretion for a trial judge to order a new trial based upon vaguely defined conduct of counsel and conduct of the jury not reflected in the record?

On cross-appeal, Stevens presents us with the following question:

V. Can the cross-appellee recover compensation for medical expenses incurred by the United States Government after the Government has compromised and settled its claim for those same expenses?

As we shall respond to questions I., IV., and V. in the negative, we shall vacate the judgment and remand the case to the Circuit Court for Anne Arundel County for a new trial. Nevertheless, we shall consider the remaining issues to assist the trial court in conducting the new trial.

### Facts

The tragic event that precipitated this appeal occurred on 30 April 1993. On that day, Piquette, a Naval Academy Midshipman First Class, was riding his bicycle in preparation for an impending triathlon. Near the intersection of Crownsville and Chesterfield Roads, in Anne Arundel County, Piquette collided with a pick-up truck driven by Stevens, and owned by Stevens's employer, T.M. Branzell & Sons, Inc. (Branzell). Piquette was severely injured in the collision, and was transported by helicopter to the Maryland Shock Trauma Center.

There is a "T" shaped intersection where Crownsville and Chesterfield Roads meet. The flow of traffic entering Crownsville Road is controlled by a stop sign on Chesterfield Road. Piquette was traveling eastbound on Chesterfield Road. When he arrived at the intersection, he made a right turn onto

Crownsville Road, intending to proceed in a southerly direction and proceeded approximately seven feet in a southerly direction. Stevens was traveling northbound on Crownsville Road. When Stevens attempted to make a left turn onto westbound Chesterfield Road the collision occurred. In other words, both parties were making, or just had made, turns when the collision occurred.

It is undisputed that Piquette did not make a complete stop before he began to turn right onto Crownsville Road. There is some dispute as to the manner in which Stevens began to turn left onto Chesterfield Road just prior to the collision. Crownsville Road consists of two lanes, separated by a double yellow line. Several witnesses testified at trial that Stevens began his left hand turn onto westbound Chesterfield Road before the broken double yellow line on Crownsville Road. In effect, this placed Stevens's truck in the southbound lane of Crownsville Road when he began to turn left onto Chesterfield Road.

Piquette incurred medical expenses exceeding Seventy Five Thousand Dollars ($75,000). Since Piquette was a student at the Naval Academy, his past and future medical expenses were assumed by the United States Government (the government). The government sought to recover these expenses pursuant to 10 U.S.C. § 1095 and 42 U.S.C. §§ 2651—2653 (Medical Care Recovery Act)(the Act). Although the government had agreed that counsel for Piquette would also pursue its claim, its claim was ultimately settled directly with Stevens's insurer.

Piquette then filed a complaint, seeking to recover damages from both Stevens and Branzell. When his claim against Branzell was dismissed, only Stevens remained as defendant. Prior to trial, Piquette filed a motion in limine seeking to present his medical expenses to the jury as damages. The motion was granted.

Ultimately, a jury returned a verdict in favor of Piquette for $759,500. Stevens then filed a motion for judgment notwithstanding the verdict (JNOV), or in the alternative, for a new

trial, or to revise the judgment. The motion for JNOV was granted on the ground that Piquette had assumed the risk as a matter of law. In addition, the trial court granted Stevens's motion for a new trial. This appeal followed.

## I.

We now turn to the first issue presented by Piquette: whether, as a matter of law, Piquette assumed the risk of being struck by Stevens's truck by making a right turn onto Crownsville Road without making a complete stop.

As we begin, we believe it would be useful to set forth the standard of review when considering whether a motion for JNOV was properly granted.

"A motion for judgment notwithstanding the verdict tests the legal sufficiency of the evidence and is reviewed under the same standard as a motion for judgment made during trial." *Nationwide Mut. Fire Ins. Co. v. Tufts,* 118 Md.App. 180, 190, 702 A.2d 422 (1997), *cert. denied,* 349 Md. 104, 707 A.2d 89 (1998). "In reviewing a trial court's denial of a motion for judgment in a jury trial, we must conduct the same analysis as the trial court, viewing all evidence in the light most favorable to the non-moving party." *Id.* at 189, 702 A.2d 422. Moreover, "we must assume the truth of all credible evidence and all inferences of fact reasonably deductible from the evidence...." *Id.* at 190, 702 A.2d 422. "If there exists any legally competent evidence, however slight, from which the jury could have found as it did, we must affirm the trial court's denial of the motion." *Id.* at 191, 702 A.2d 422. Conversely, we must reverse the trial court's grant of the motion if there exists any legally competent evidence from which the jury could have found as it did.

As we have said, the trial court granted Stevens's motion for a JNOV because it concluded that Piquette had, as a matter of law, assumed the risk in making a right turn onto Crownsville Road without making a complete stop at the stop sign facing him. The Court of Appeals has defined assump-

tion of the risk as "an intentional and voluntary exposure to a known danger and, therefore, consent on the part of the plaintiff to relieve the defendant of an obligation of conduct toward him and to take his chances from harm from a particular risk." *Rogers v. Frush,* 257 Md. 233, 243, 262 A.2d 549 (1970). As Chief Judge Bell has observed for the Court in *ADM Partnership v. Martin,* 348 Md. 84, 90–91, 702 A.2d 730 (1997), "In Maryland, it is well settled that in order to establish the defense of assumption of risk, the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." "In determining whether a plaintiff had knowledge and appreciation of the risk, an objective standard must be applied and a plaintiff will not be heard to say that he did not comprehend a risk which must have been obvious to him." *Id.* at 91, 702 A.2d 730 (quoting *Gibson v. Beaver,* 245 Md. 418, 421, 226 A.2d 273 (1967)). Ordinarily, whether a plaintiff has assumed a risk is a question for the trier of facts. *Chalmers v. Willis,* 247 Md. 379, 385, 231 A.2d 70 (1967). "On the other hand, when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger, the issue is for the court." *Schroyer v. McNeal,* 323 Md. 275, 283–84, 592 A.2d 1119 (1991).

■ Here, we believe the trial court improperly granted Stevens's motion for a JNOV on the ground that Piquette had, as a matter of law, assumed the risk of making a right turn onto Crownsville Road without coming to a complete stop at the stop sign facing him. We shall explain.

There was ample evidence before the jury for it to determine, as it obviously did, that Piquette did not assume the risk. We must keep in mind, however, that we must view all of the evidence and the inferences fairly deducible therefrom in a light most favorable to Piquette. According to several witnesses, following the collision, Stevens's truck came to rest in the southbound lane of Crownsville Road. According to an accident reconstruction expert presented by Piquette, Stevens had begun to make a left turn before the broken yellow lines

on Crownsville Road, placing him in Piquette's lane of travel when the collision occurred. According to Piquette, before he began to make a right turn onto Crownsville Road, he saw a vehicle "coming from my right to my left on Crownsville Road." Despite this, Piquette did not make a complete stop, but rolled through the stop sign facing him,[2] and made a right turn onto Crownsville Road.[3] Thus, the jury could have reasonably inferred that Piquette did not believe himself to be in danger from the approaching vehicle when, without coming to a complete stop, he began his right turn onto Crownsville Road. Hence, there was ample evidence for the jury to conclude that Piquette had not assumed a risk in making this turn.

As we also said, whether a person has assumed a risk is ordinarily one for the trier of facts. *Chalmers* at 385, 231 A.2d 70. Consequently, had the trial court concluded that Piquette, as a matter of law, had assumed the risk in making a right turn onto Crownsville Road, it should not have submitted the issue to the jury. Under such circumstances, the issue is for the court. *Schroyer,* 323 Md. at 283–84, 592 A.2d 1119.

According to the evidence we have recounted, it was not at all clear that Piquette, certainly a person of normal intelligence, would have anticipated the risk of danger that ensued from his not making a complete stop at the stop sign before making a right turn onto Crownsville Road. Put another way, we do not believe Piquette had clear knowledge of, or appreciated the risk that, by not making a complete stop before making a right turn onto Crownsville Road, he would assume the risk of colliding with a vehicle traveling northbound on Crownsville Road. As the Court of Appeals put it in *ADM Partnership,* for assumption of the risk to apply, it is necessary for the defendant to show that the plaintiff had knowledge of the risk; appreciation of the risk; and voluntarily

---

2. Often referred to as a rolling or California stop.

3. We learned at oral argument that the stop sign facing Piquette was more than twenty (20) feet back from the intersection.

confronted the risk. *Id.* at 90–91, 702 A.2d 730. Since Piquette had no knowledge or appreciation of such a risk, we fail to see how he could have voluntarily confronted it. Consequently, he could not have, as a matter of law, assumed the risk. Thus, we believe Stevens's motion for a JNOV was not properly granted.

## II.

We must now determine whether it was an abuse of the trial court's discretion to grant Stevens's motion for a new trial. In Piquette's view, the trial court abused its discretion because it granted Stevens a new trial based on rather vague "conduct of counsel" that may have influenced the jury's verdict. In granting Stevens's motion for a new trial, the trial court said, "If ever there was a case that this Court believed was not fairly presented to this jury, and confused the jury, it was this case."

In response to question IV., we need look no further than *Buck v. Cam's Broadloom Rugs, Inc.*, 328 Md. 51, 612 A.2d 1294 (1992), where the Court of Appeals said:

[T]he breadth of a trial judge's discretion to grant or deny a new trial is not fixed and immutable; rather, it will expand or contract depending upon the nature of the factors being considered, and the extent to which the exercise of that discretion depends upon the opportunity the trial judge had to feel the pulse of the trial and to rely on his own impressions in determining questions of fairness and justice.

In the case before us, the range of discretion of the trial judge was necessarily at its broadest. The motion for a new trial did not deal with the admissibility or quality of newly discovered evidence, nor with technical matters. Instead, it asked the trial judge to draw upon his own view of the weight of the evidence; the effect of an accumulation of alleged errors or improprieties by defense counsel, no one of which may have been serious enough to provoke a request for, or justify the granting of, a mistrial; and the allegedly inadequate verdict, in determining whether justice would be

served by granting a new trial. Under circumstances such as this, the power to grant a new trial is 'an equitable one in its nature.' (citation omitted.) Because the exercise of discretion under these circumstances depends so heavily upon the unique opportunity the trial judge has to closely observe the entire trial, complete with nuances, inflections, and impressions never to be gained from a cold record, it is a discretion that will rarely, if ever, be disturbed on appeal. *Id.* at 58–59, 612 A.2d 1294.

Here, the breadth of the trial court's discretion was at its broadest, because Stevens's "motion for a new trial did not deal with the admissibility or quality of newly discovered evidence, nor with technical matters. Instead, it asked the trial judge to draw upon his own view of the weight of the evidence; the effect of an accumulation of alleged errors or improprieties by ... counsel, no one of which may have been serious enough to provoke a request for, or justify the granting of, a mistrial;...." *Id.* at 59, 612 A.2d 1294. We have carefully considered the trial court's reasons for granting a new trial, and find them to be, although somewhat vague, sufficient to grant a new trial. We are mindful that, because it is the trial court's duty "to closely observe the entire trial, complete with nuances, inflections, and impressions never to be gained from a cold record, it is a discretion that will rarely, if ever, be disturbed on appeal." *Id.* In short, there was no abuse of discretion.

### III.

▇ On cross-appeal, we must determine whether Piquette can "recover compensation for medical expenses incurred by the United States Government after the Government has compromised and settled its claim for those same expenses." He cannot.

Prior to the Act being enacted by Congress, the Court of Appeals said in *Plank v. Summers*, 203 Md. 552, 102 A.2d 262 (1954), following an extensive review of similar cases in other jurisdictions:

It ... appears that the majority of the cases hold that where hospital and medical services are furnished gratuitously to the injured party, he can recover the value of those services from the tort feasor. This seems to be the modern rule. Here also it might well be considered that medical and hospital services supplied by the Government to these members of the United States Navy were part of the compensation to them for services rendered, and therefore that by their service in the Navy they had paid for these. If, by their services, the appellants paid for the medical and hospital expenses, certainly the value of these are proper items for the jury to consider in arriving at the amount of damages to be paid by the appellee.

*Id.* at 562, 102 A.2d 262. Hence, it appears that, prior to the Act, Piquette would have been entitled to recover as damages medical expenses under the collateral source doctrine even though such expenses had been gratuitously provided by the government. Nevertheless, we must consider the Act's effect, if any, on *Plank v. Summers.*

We begin by noting that when we are called upon to construe a statute, "the cardinal rule of statutory construction is to ascertain and effectuate legislative intent." *Motor Vehicle Admin. of the Maryland Dept. of Transp. v. Seidel Chevrolet, Inc.,* 326 Md. 237, 248, 604 A.2d 473 (1992). "[T]he beginning point of statutory construction is the language of the statute itself." *Id.* at 248, 604 A.2d 473 (quoting *Morris v. Prince George's County,* 319 Md. 597, 603–604, 573 A.2d 1346 (1990)). "Even when the words of a statute carry a definite meaning, we are not 'precluded from consulting legislative history as part of the process of determining the legislative purpose or goal' of the law." *Id.* at 249, 604 A.2d 473.

The Act was enacted by Congress in 1962 in response to the decision of the Supreme Court in *United States v. Standard Oil Co.,* 332 U.S. 301, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947). In *Standard Oil,* the Supreme Court said that the government was not entitled to recover medical expenses gratuitously

provided to military personnel injured by third party tortfeasors.

According to the Act, however:

> [T]he United States shall have a right to recover (independent of the rights of the injured or diseased person) from said third person, or that person's insurer, the reasonable value of the care and treatment so furnished, to be furnished, paid for, or to be paid for and shall, as to this right be subrogated to any right or claim that the injured or diseased person, ... has against such third person to the extent of the reasonable value of the care and treatment. . . .

42 U.S.C. § 2651(a).

> No action taken by the United States in connection with the rights afforded under this legislation shall operate to deny to the injured person the recovery for that portion of his damage not covered hereunder.

42 U.S.C. § 2652(c).

 In applying the ordinary principles of statutory construction, we must first examine the language used in the Act. Section 2651(a) of the Act provides that "[T]he United States shall have a right to recover ... from said third person, or that person's insurer, the reasonable value of the care and treatment so furnished ... and shall, as to this right be subrogated to any right or claim that the injured ... person, ... has against such third person. . . ." Put another way, the government is placed by the Act in the shoes of the injured party, enabling it to pursue its claim by joining or intervening in an action instituted by the injured party against the tortfeasor, or the government may institute its own action against the tortfeasor. *Conley v. Maattala*, 303 F.Supp. 484, 485 (D.N.H.1969).

 In the case sub judice, § 2652(c) provides that no action taken by the government shall deny the injured party's right to recover "that portion of his damage not covered

hereunder." Section 2652(c)'s legislative history illuminates this point:

> This section makes it clear that the right of recovery granted to the Government shall not impair the right of the injured person to recover for himself damages **other than the cost of hospital and medical care furnished by the Government**, and no action taken by the Government in connection with its right or recovery shall have that effect.

Act of September 25, 1962, Pub.L. No. 87–693, § 1, 1962 U.S.C.C.A.N. (76 Stat.) 593. (Emphasis added.) Hence, in enacting the Act, it is clear that Congress clearly envisioned that if the government sought to recover medical expenses gratuitously afforded an injured party, the Act precluded the injured party from recovering such expenses under the collateral source doctrine. Our conclusion is further supported by those federal courts that have considered the Act. The Sixth Circuit says that the purpose of the Act was "to prevent the unjust enrichment of victims, who were able to recover under the permissive decisions allowing recovery under the collateral source doctrine, . . . ." *United States v. Trammel,* 899 F.2d 1483, 1486 (6ᵗʰ Cir.1990). *See, United States v. Jones,* 264 F.Supp. 11, 15 (E.D.Va.1967); *see also, United States v. Leonard,* 448 F.Supp. 99, 101 (W.D.N.Y.1978); *United States v. Neal,* 443 F.Supp. 1307, 1314 (D.Neb.1978). In *McCotter v. Smithfield Packing Co., Inc.,* 868 F.Supp. 160, 163 (E.D.Va. 1994), the District Court said:

> Under the Federal Medical Care Recovery Act, the claim for medical damages suffered as the result of a tortious act and provided by the United States belongs solely to the United States. The individual plaintiff has no claim whatsoever for these damages, and should not be permitted to put on evidence of these damages unless the United States will recover those monies. Insofar as medical expenses which the United States is required by law to furnish are concerned, there is no collateral source permitting plaintiffs to collect these expenses, as the sums belong to the United States. The plaintiff can, however, present the govern-

ment's claim for medical damages in the plaintiff's case in chief if the United States has authorized such.

In sum, Piquette may not recover medical expenses afforded by the government under the collateral source doctrine. Consequently, that issue should not have been submitted to the jury.

■■■ We do not agree, however, that the Act entirely eliminates the collateral source doctrine for those injured by third party tortfeasors, for whom the government has gratuitously afforded medical expenses. To the contrary, "the Act contemplates that the injured party may have a claim for those same expenses . . . ." pursuant to the collateral source doctrine. *Guyote v. Mississippi Valley Gas Co.*, 715 F.Supp. 778, 780 (S.D.Miss.1989). "[W]here the United States does not assert its right under the Act, the injured party may recover." *Id. See also, Whitaker v. Talbot*, 122 Ga.App. 493, 177 S.E.2d 381 (1970); *Arvin v. Patterson*, 427 S.W.2d 643 (Tex.Civ.App.1968, writ ref'd n.r.e.); 22 Am.Jur.2d *Damages* § 573 (1988). Thus, *Plank v. Summers* is still alive.

In the case at hand, however, as the government chose to settle its claim directly with Stevens's insurer, Piquette may not recover such expenses under the collateral source doctrine. We do not mean to be read as saying, however, that all of an injured party's medical expenses may not be presented to a court or jury as damages.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY FOR A NEW TRIAL. COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.**