## GROUP HEALTH ASSOCIATION, INC. *v.* PATRICIA LYNNE BLUMENTHAL, GEORGE M. BLUMENTHAL AND DIANA BARROWS

[Misc. No. 7, September Term, 1981.]

*Decided January 4, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*J. Thomas Lenhart,* with whom were *William P. Barr* and *Shaw, Pittman, Potts & Trowbridge* and *David H. Martin* on the brief, for appellant.

*Keith S. Franz* and *Jonathan A. Azrael,* with whom were *Azrael & Gann* on the brief, for appellees Patricia Lynne and George M. Blumenthal. *Darryl A. Adams,* with whom was *John Jude O'Donnell* on the brief, for appellee Diana Barrows.

ELDRIDGE, J., delivered the opinion of the Court.

The United States District Court for the District of Maryland, pursuant to the Uniform Certification of Questions of Law Act, Maryland Code (1974, 1980 Repl. Vol.), §§ 12-601 through 12-609 of the Courts and Judicial Proceedings Article, certified to this Court five questions arising out of a medical malpractice case. Before addressing each of these questions, a review of the pertinent facts is in order.

Group Health Association (GHA), a non-profit District of Columbia corporation, is a Health Maintenance Organization (HMO) as defined in the Maryland Health

Maintenance Organization Act, Code (1982), § 19-701 (e) of the Health-General Article.[1] It holds a certificate of authority to operate in Maryland issued by the State Insurance Commissioner pursuant to § 19-711 of the Health-General Article. GHA, as an HMO, provides comprehensive health care services to its members for a monthly premium.

In the fall of 1979, Patricia Blumenthal, a GHA member and a resident of Maryland, contacted GHA because she believed that she was pregnant. Between November 27 and December 12, 1979, Mrs. Blumenthal received prenatal care from Dr. Diana Barrows who is an obstetrician-gynecologist, from C. Gordon who is a nurse-midwife, and from an unnamed physician, all employed by GHA. Mrs. Blumenthal allegedly informed these GHA personnel of her medical history. Her history included complications in two previous pregnancies caused, according to the plaintiffs, by an

---

1. Code (1982), § 19-701 (e) provides:

"(e) *Health maintenance organization.* — 'Health maintenance organization' means any person, including a profit or nonprofit corporation organized under the laws of any state or country, that:

(1) Operates or proposes to operate in this State;

(2) Except as provided in § 19-703 (b) of this subtitle with respect to hospitalization services, provides or otherwise makes available to its members health care services that include at least physician, hospitalization, laboratory, x-ray, emergency, and preventive services, out-of-area coverage, and any other health care services that the Commissioner determines to be available generally on an insured or prepaid basis in the area serviced by the health maintenance organization, and, at the option of the health maintenance organization, may provide additional coverage;

(3) Except for any copayment or deductible arrangement, is compensated only on a predetermined periodic rate basis for providing to members the minimum services that are specified in item (2) of this subsection;

(4) Assures its subscribers and members, the Commissioner, and the Department that one clearly specified legal and administrative focal point or element of the health maintenance organization has the responsibility of providing the availability, accessibility, quality, and effective use of comprehensive health care services; and

(5) Primarily provides services of physicians:

(i) Directly through physicians who are either employees or partners of the health maintenance organization; or

(ii) Under arrangements with one or more groups of

incompetent cervix.[2] This condition had required surgical closure of Mrs. Blumenthal's cervical os in her prior pregnancies. The Blumenthals called this surgical closure a McDonald's procedure.[3]

During an appointment with Dr. Barrows on December 12, 1979, Mrs. Blumenthal allegedly inquired about scheduling a McDonald's procedure. According to Mrs. Blumenthal, Dr. Barrows said that the procedure was unnecessary at that time. Mrs. Blumenthal also discussed a proposed automobile trip from Maryland to Tennessee which Dr. Barrows stated would not be harmful to her condition. Early in January 1980, while still in Tennessee, Mrs. Blumenthal, who was approximately four and one-half months pregnant, gave birth to a female child, Grace Anne Blumenthal, who died about 2½ hours after delivery.

On February 23, 1981, Mrs. Blumenthal and her husband filed a malpractice claim against Dr. Barrows with the Health Claims Arbitration Office pursuant to Maryland's Health Care Malpractice Claims Act, Code (1974, 1980 Repl. Vol.), § 3-2A-02 (a) of the Courts and Judicial Proceedings Article (hereafter sometimes referred to as "the Act").[4]

---

physicians, who are organized on a group practice or individual practice basis, under which each group:

    1. Is compensated for its services primarily on the basis of an aggregate fixed sum or on a per capita basis; and

    2. Is provided with an effective incentive to avoid unnecessary inpatient use, whether the individual physician members of the group are paid on a fee-for-service or other basis."

**2.** An incompetent cervix has a defect in the muscular ring at the internal cervical os that leaves the cervix abnormally prone to dilation during the second trimester of pregnancy. Without surgical intervention, this condition will result in premature expulsion of the fetus. Dorland's Medical Dictionary 293 (25th ed. 1974); Stedman's Medical Dictionary 997 (24th ed. 1982).

**3.** This procedure is best known as a Shirodkar, named after the Indian obstetrician and gynecologist, N. V. Shirodkar, who revolutionized the treatment of incompetent cervices. In a Shirodkar, the cervical os is closed by purse-string suturing with nonabsorbent suture material. Stedman's Medical Dictionary, *supra* note 3, at 987 and 1281. As indicated by the record in the present case, the procedure is most effective if performed sometime during the 15th to 17th week of gestation.

**4.** *See* Attorney General v. Johnson, 282 Md. 274, 278-281, 385 A.2d 57 (1978), for an overview of the operation of the Act as well as the circumstances that precipitated its enactment.

Section 3-2A-02 (a) subjects to the mandatory arbitration provisions of the Act "[a]ll claims, suits, and actions, including cross claims, third-party claims, and actions under Title 3 Subtitle 9 of this article, by a person against a health care provider for medical injury allegedly suffered by the person in which damages of more than $5,000 are sought." Only after the completion of arbitration may a claimant initiate a lawsuit based on the malpractice, § 3-2A-06.

The Blumenthals also filed a diversity action against GHA in the United States District Court for the District of Maryland on March 4, 1981. Their complaint alleged that "GHA, acting through its agents and employees, knew or should have known that [Mrs. Blumenthal] could not be expected to carry her baby to term unless the McDonald's Procedure was performed." The Blumenthals further alleged that GHA, through its agents and employees, was negligent in not performing the McDonald's procedure promptly, in advising Mrs. Blumenthal that she could safely take a long car trip, and in failing to closely monitor Mrs. Blumenthal. The Blumenthals sought damages for Mrs. Blumenthal's injuries, for injuries to their marital relationship, and for the wrongful death of their child.

On April 1, 1981, GHA moved to dismiss the Blumenthals' suit without prejudice on the ground that it was a "claim . . . against a health care provider" which was subject to mandatory arbitration under the Health Care Malpractice Claims Act. GHA alternatively moved to stay the lawsuit pending completion of the arbitration process.[5]

The Blumenthals opposed both of these motions and moved to certify to this Court whether their claim against GHA was subject to mandatory arbitration. The Blumenthals also agreed with counsel for Dr. Barrows to stay the arbitration proceeding pending the outcome of their suit against GHA.

---

5. Compliance with the Health Care Malpractice Claims Act, if applicable, is a prerequisite to bringing a diversity suit in federal court. Davison v. Sinai Hospital of Baltimore, 462 F.Supp. 778 (D. Md. 1978), aff'd, 617 F.2d 361 (4th Cir. 1980). See also Edelson v. Soricelli, 610 F.2d 131 (3d Cir. 1979); Woods v. Holy Cross Hospital, 591 F.2d 1164 (5th Cir. 1979).

GHA then filed a third-party complaint for indemnification and contribution against Dr. Barrows.

The United States District Court issued an order, certifying to this Court the following five questions of law:

"Question 1. Is defendant, Group Health Association, Inc. ('GHA') a 'health care provider' within the meaning of the Health Care Malpractice Claims Act, Md. Ann. Code *Cts. & Jud. Proc.* § 3-2A-01 (e) so that the action against it for alleged malpractice is subject to mandatory arbitration under the Maryland Health Care Malpractice Claims Act?

"Question 2. If the answer to Question 1 is 'No,' is an action in which plaintiffs seek to hold a Health Maintenance Organization ('HMO') liable on a *respondeat superior* theory for alleged malpractice of 'health care providers' in its employ nevertheless subject to mandatory arbitration under the Maryland Health Care Malpractice Claims Act?

"Question 3. If the answer to Question 1 or Question 2 is 'Yes,' does a Maryland court have jurisdiction to accept the filing of a declaration against an HMO prior to or during mandatory arbitration involving said HMO in order to toll the running of any applicable statute of limitations or for any other reason?

"Question 4. If the answers to Question 1 and Question 2 are 'No,' or if the answer to Question 3 is 'Yes,' is a third-party claim by GHA for contribution and/or indemnity against the 'health care providers,' who are allegedly primarily or jointly liable in this action, subject to mandatory arbitration under the Maryland Health Care Malpractice Claims Act?

"Question 5. If the answers to Question 1 and Question 2 are 'No,' or if the answer to Question 3 is 'Yes,' does Maryland recognize a cause of action

for the wrongful death of a 19-20 week old fetus under the facts alleged by plaintiffs in this case?"

We shall address these questions seriatim.

## I. Is GHA a "Health Care Provider?"

Section 3-2A-01 (e) of the Health Care Malpractice Claims Act defines "health care provider" as follows:

" 'Health care provider' means a hospital, a related institution as defined in § 19-301 of the Health-General Article, a physician, an osteopath, an optometrist, a chiropractor, a registered or licensed practical nurse, a dentist, a podiatrist, and a physical therapist, licensed or authorized to provide one or more health care services in Maryland."

"Related institution," as defined in § 19-301 (j) of the Health-General Article,

"means an organized institution, environment, or home that:

(i) Maintains conditions or facilities and equipment to provide domiciliary, personal, or nursing care for 2 or more unrelated individuals who are dependent on the administrator, operator, or proprietor for nursing care or the subsistence of daily living in a safe, sanitary, and healthful environment; and

(ii) Admits or retains the individuals for overnight care."

Under the statutory definition of an HMO, *supra* n. 1, it is neither a hospital nor a related institution. Consequently, it is clear from the plain meaning of the Health Care Malpractice Claims Act that an HMO, itself, is not included within the definition of health care provider.

### II. Is the Blumenthals' claim against GHA subject to mandatory arbitration?

Notwithstanding that GHA is not a "health care provider," the Blumenthals' claim against GHA falls within the provisions of the Health Care Malpractice Claims Act. Therefore the claim is subject to mandatory arbitration.

The Blumenthals do not allege that GHA itself was negligent; instead, the complaint against GHA is based on the doctrine of *respondeat superior.* Simply stated, the Blumenthals hope to prove that Dr. Barrows and other GHA employees were negligent in treating Mrs. Blumenthal, and that GHA as their employer is vicariously liable for that negligence.

The mandatory arbitration provisions in § 3-2A-02 (a) of the Health Care Malpractice Claims Act apply to "[a]ll claims, suits, and actions, including cross claims, third-party claims, . . . by a person against a health care provider." GHA asks us to construe this provision so that any claim based on the malpractice of a health care provider will be subject to arbitration. Essentially, GHA asserts that the word "claims" is broader than "suits" or "actions" and should be so interpreted. The Blumenthals, on the other hand, contend that the word "claims" in the Act refers only to cross claims and third-party claims.

Preliminarily, we reject the contention that the Legislature intended to limit the scope of the word "claims" by the language "including cross claims [and] third-party claims." Ordinarily the word "including" means comprising by illustration and not by way of limitation. *See, e.g., United States v. New York Tel. Co.,* 434 U.S. 159, 169, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977); *Helvering v. Morgan's, Inc.,* 293 U.S. 121, 125 n. 1, 55 S.Ct. 60, 79 L.Ed. 232 (1934); *Black's Law Dictionary,* 905 (4th ed. 1968). *See also* Code (1982), § 1-101 of the Health-General Article. Thus we do not construe the reference to cross claims and third-party claims as indicating an exclusive listing of the claims subject to arbitration.

The critical language in § 3-2A-02 (a) covers "*all* claims ... by a person against a health care provider for medical injury allegedly suffered by the person . . . ." This language is sufficient to encompass a claim against a health care provider which also forms the basis for *respondeat superior* liability on the part of the health care provider's employer, whether or not that employer is itself a health care provider. We have previously pointed to the broad scope of the term "claim." In distinguishing between a "claim" and a "cause of action," the Court stated in *White v. Land Homes Corporation,* 251 Md. 603, 610-611, 248 A.2d 159 (1968):

> "a 'claim' ... has been defined as a 'group or aggregate of operative facts giving ground or occasion for judicial action,' as distinguished from the narrow concept of a 'cause of action.' 3 Moore, *Federal Practice* (2d Ed. 1968) § 14.07 at 509."

*See also Brooks v. Ford Motor Credit Co.,* 261 Md. 278, 281-282, 274 A.2d 345 (1971); *Edmonds v. Lupton,* 253 Md. 93, 100-101, 252 A.2d 71 (1969); *Harford Sands, Inc. v. Levitt & Sons,* 27 Md.App. 702, 708-709, 343 A.2d 544 (1975). In the instant case, the Blumenthals' claim, that is the "aggregate of operative facts" giving rise to the action, is the alleged malpractice of Dr. Barrows and other employees of GHA. Although the Blumenthals seek to impose liability for their claim upon the employer GHA, the aggregate of operative facts is still the alleged malpractice of the health care providers.

Additional support for a broad interpretation of the word "claims" may be found in § 5-109 of the Courts and Judicial Proceedings Article. The section was enacted along with the Health Care Malpractice Claims Act by ch. 235 of the Acts of 1976. Section 5-109, prescribing the limitations period for medical malpractice actions, covers "action[s] for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider, as defined in § 3-2A-01." The final sentence of § 5-109 states that filing of a claim with the Health Claims Arbitration Office is equivalent to the filing of an action for limitations

purposes. The Legislature clearly intended § 5-109 to encompass all claims subject to arbitration, yet the application of § 5-109 is not limited to actions in which a health care provider is a defendant. Instead, § 5-109 covers all actions "arising out of the rendering of or failure to render professional services by a health care provider."

Moreover, construing § 3-2A-02 (a) to cover the Blumenthals' claim against GHA comports with and furthers the legislative intent in enacting the Health Care Malpractice Claims Act. The legislative intent may be gleaned from the *Medical Malpractice Insurance Study Committee Report to the President of the Senate and the Speaker of the House.*[6] This report delineates the primary object of the Committee's proposal (*id.* at 3, emphasis added):

> "The basic proposal of the Committee is the requirement that *all* health care malpractice claims over $5,000 shall be submitted to arbitration prior to the filing of suit."

The goal of the Committee's proposals was to establish a "mechanism to screen malpractice claims prior to the filing of suit." *Report* at 3. In the Committee's view, this would reduce the cost of defense by ferreting out unmeritorious claims which, in turn, would lower the cost of malpractice insurance and, potentially, overall health care costs. The Committee's proposed § 3-2A-02 (a) was enacted verbatim in ch. 235 of the Acts of 1976. As stated in its title, ch. 235 was "for the purpose of providing for a mandatory arbitration system for *all* medical malpractice claims in excess of a certain amount." (Emphasis added.) In light of the legislative history and the title of ch. 235, it would appear that the Legislature contemplated a far-reaching requirement to arbitrate medical malpractice claims.[7]

---

**6.** The Committee was appointed by the President of the Senate and the Speaker of the House of Delegates on July 23, 1975, as a special task force to investigate problems arising in the medical malpractice insurance area.

**7.** In Musso v. Westfield Memorial Hospital, 64 A.D.2d 851, 407 N.Y.S.2d 605 (1978), a New York court construed that state's medical malpractice statute as encompassing a claim against an employer based on *respondeat superior*. In so holding, the court stated (407 N.Y.S.2d at 608):

We therefore hold that § 3-2A-02 (a) encompasses a claim of malpractice by a health care provider, whether it forms the basis of a suit against that health care provider or a suit against a non-health care provider under the doctrine of *respondeat superior.*

### III. Can a Maryland court accept the filing of a declaration against an HMO prior to or during mandatory arbitration?

A Maryland court should not accept a declaration seeking to impose *respondeat superior* liability upon an HMO, based on the medical malpractice of its employee health care provider, prior to or during mandatory arbitration. To permit a claimant to file such a suit would contravene § 3-2A-02 (a). That section provides in part: "An action or suit [by a person against a health care provider for medical injury suffered by the person] may not be brought or pursued in any court of this State *except in accordance with this subtitle.*" (Emphasis added.) Section 3-2A-06 delineates the procedure for obtaining judicial review of an arbitration decision *after* an award has been entered. The section allows dissatisfied parties to reject the award for any reason, but it conditions nullification of the award on the filing of a court action within 30 days of service of the award on the rejecting party. § 3-2A-06 (a) & (b) of the Courts and Judicial Proceedings Article. As this Court has previously stated, the Act "requires that malpractice disputes be submitted to nonbinding arbitration as *a condition precedent to the*

---

"Logic compels the conclusion that where the injury-producing negligent act or omission occurs in the diagnosis, care or treatment of a patient and is committed by a physician who is acting in the scope of his employment by a hospital, an action against the hospital premised upon such negligence should be subject to the jurisdiction of a medical malpractice panel because the underlying basis of liability is the alleged malpractice of the doctor."

Although the New York statute differs greatly from § 3-2A-02 (a), the analysis is apposite to the instant case where the claim against an HMO is based on its employees' negligence.

*institution* of a court action." *Attorney General v. Johnson,* 282 Md. 274, 283-284, 385 A.2d 57 (1978) (emphasis added).

Moreover, it is unnecessary to permit a claimant to file a declaration in court prior to an arbitration decision. First, the filing and subsequent acceptance of a declaration necessitates some expenditure of both judicial and litigant resources, which might be conserved if the arbitration decision is acceptable. These are precisely the type of expenditures that the Legislature sought to avoid by enacting the Health Care Malpractice Claims Act. Second, filing a declaration will not accomplish anything not accomplished by filing a claim with the Health Claims Arbitration Office. Section 5-109 of the Courts and Judicial Proceedings Article provides:

"§ 5-109. Actions against physicians.

An action for damages for an injury arising out of the rendering of or failure to render professional services by a health care provider, as defined in § 3-2A-01 of this article shall be filed (1) within five years of the time the injury was committed or (2) within three years of the date when the injury was discovered, whichever is the shorter. If the claimant was under 16 years of age at the time the injury was committed, the time shall commence when he reaches the age of 16. Filing of a claim with the Health Claims Arbitration Office in accordance with § 3-2A-04 of this article shall be deemed the filing of an action for purposes of this section."

Thus, filing a claim in court is not a prerequisite for tolling the statute of limitations.

IV. Is GHA's third-party complaint against
Dr. Barrows subject to mandatory arbitration?

Although under the wording of the certified questions it is not necessary to respond to this question, for guidance in future cases we shall answer it in the affirmative. GHA's

claim against Dr. Barrows clearly falls within the purview of § 3-2A-02 (a). That section, as previously noted, covers "[a]ll claims . . . including . . . third-party claims . . . by a person against a health care provider for medical injury suffered by the person."

The rules of interpretation for the Maryland Code provide that the "word person shall include corporation." Code (1957, 1981 Repl. Vol.), Art. 1, § 15. Thus a third-party claim by an HMO is a claim "by a person." As Dr. Barrows is a physician and, as such, is a health care provider as defined in § 3-2A-01 (e), the claim is "against a health care provider" within the meaning of the Act.

Finally, the third-party claim is for a "medical injury" within the meaning of § 3-2A-02 (a). Section 3-2A-01 (f) defines "medical injury" as an "injury arising or resulting from the rendering or failure to render health care." This definition of "medical injury" plainly encompasses GHA's claimed injury. According to GHA, if Dr. Barrows is found to have been negligent in rendering medical care to Mrs. Blumenthal, and liability for that negligence is imputed to GHA, then GHA will have suffered a medical injury as defined in § 3-2A-01 (f). GHA's injury will have arisen out of Barrows's rendering of medical care.

Therefore, GHA's third-party claim against Dr. Barrows falls within § 3-2A-02 (a) and is subject to mandatory arbitration.

## V. Does Maryland recognize a cause of action for the wrongful death of a 19-20 week old fetus born alive?

GHA contends that there can be no cause of action for the wrongful death of a live born child if the child sustained the actionable injuries prior to viability. We reject that contention, finding that the concept of viability has no role in a case, such as this, where the child is born alive.

One of the first cases permitting recovery for prenatal injuries prior to viability to a child subsequently born alive

was *Hornbuckle v. Plantation Pipe Line Company,* 212 Ga. 504, 93 S.E.2d 727 (1956). There, the Supreme Court of Georgia stated (*id.* at 504-505):

> "If a child born after an injury sustained at any period of its prenatal life can prove the effect on it of a tort, it would have a right to recover.
>
> * * *
>
> " 'It would be contrary to every principle of right and justice, which are the very essence of law, to deny such rights to the injured child.' "

In *Bennett v. Hymers,* 101 N.H. 483, 147 A.2d 108 (1958), the Supreme Court of New Hampshire, in permitting recovery, specifically addressed the viability distinction contended for by GHA. The court could not discern any logical basis for distinguishing "the rights of a fetus non-viable at the time of injury later born alive from those of a fetus viable when injured." 101 N.H. at 484. The court stated that "it is being oblivious to reality to say that the mother alone was injured by the tortious act and not the child." *Id.* at 485. Similar results were reached by the Alabama, Illinois, Massachusetts, New Jersey, Pennsylvania, and Rhode Island Supreme Courts. *Wolfe v. Isbell,* 291 Ala. 327, 280 So.2d 758 (1973); *Green v. Smith,* 71 Ill.2d 501, 377 N.E.2d 37 (1978); *Torigian v. Watertown News Co.,* 352 Mass. 446, 225 N.E.2d 926 (1967); *Smith v. Brennan,* 31 N.J. 353, 157 A.2d 497 (1960); *Sinkler v. Kneale,* 401 Pa. 267, 164 A.2d 93, 96 (1960); *Sylvia v. Gobeille,* 101 R.I. 76, 220 A.2d 222 (1966).

Two of the above-cited cases are particularly in point. *Torigian v. Watertown News Co., supra,* 352 Mass. 446, concerned injuries to a non-viable fetus causing its premature birth and death two and one-half hours later due to its prematurity, and the Supreme Judicial Court of Massachusetts held that the complaint stated a cause of action for the wrongful death of the child. The court

considered the arguments against recovery: "lack of precedent, the avoidance of speculation or conjecture, and the encouragement of fictitious claims." 352 Mass. 448. The court noted the modern trend towards allowing recovery and stated that "[t]here is no longer a lack of precedent." *Id.* It discounted the problems of proof and possibility of fraudulent claims by referring to the fact that neither problem is present "to any greater extent than in the usual tort claim." *Id.* at 448-449.

*Wolfe v. Isbell, supra,* 280 So.2d 758, also involved a wrongful death action where the child died shortly after live birth. In holding that the deceased child's father had stated a cause of action, the Alabama Supreme Court rejected the viability distinction, stating (*id.* at 764):

> "To say now that a child will be recognized as alive and capable of inheriting, and later taking possession of property when born alive, but not recognized as alive for the purpose of sustaining injuries for which suit might be brought if they wrongfully cause its death is an incongruous result."

GHA urges us not to join the modern trend of recognizing a cause of action for non-viable fetuses born alive. GHA argues that not only would recognition be inappropriate in light of *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), but that the cases permitting recovery, having been decided before *Roe* are no longer good law. We disagree. *Roe v. Wade* concerned abortion. The decision held, as GHA states (brief at 38), "that the state's interest in prenatal life does not become compelling until viability has been attained," and that, therefore, the state cannot unduly restrict a woman's access to an abortion during the first two trimesters of pregnancy. Recognition of a cause of action for the wrongful death of a non-viable fetus born alive does not impinge on the Court's decision in *Roe.* Whether or not Mrs. Blumenthal could have aborted her child at the time the

child was born alive does not lessen the alleged negligence leading to the child's premature birth.[8]

Agreeing with the decisions in *Torigian* and *Wolfe,* we conclude that a cause of action lies for the wrongful death of a child born alive who dies as a result of injuries sustained while *en ventre sa mere.*

> *Questions answered as herein set forth.*
>
> *One third of the costs to be paid by the defendant GHA and two thirds of the costs to be paid by the plaintiffs.*

---

**8.** GHA cites Toth v. Goree, 65 Mich.App. 296, 237 N.W.2d 297 (1975), to support its position. That decision held that a three-month fetus, *not born alive,* is not a person within the wrongful death act. The court discussed the "inherent conflict in giving the mother the right to terminate the pregnancy yet holding that an action may be brought on behalf of the *same* fetus under the wrongful death act." 65 Mich.App. at 304, emphasis added. It elaborated on this "inherent conflict" with examples such as inter-family suits between a family member and the mother, and suits by the aborting mother against the physician performing the abortion. *Id.* at n. 8. Clearly, this analysis has no application to the instant case where the child was born alive. Moreover, this "inherent conflict" could not arise in Maryland due to our decision in State v. Sherman, 234 Md. 179, 198 A.2d 71 (1963) (holding that wrongful death action could be maintained for stillborn fetus only if fetus was viable at time of death).