609 A.2d 332

**Margaret MANCUSO**

**v.**

**GIANT FOOD, INC.**

**No. 158, Sept. Term, 1991.**

Court of Appeals of Maryland.

July 23, 1992.

Robert L. Ferguson, Jr. (Jodi K. Ebersole, Thieblot, Ryan, Martin & Ferguson, all on brief), Baltimore, for appellant.

Christopher R. Dunn (O'Malley & Miles, both on brief), Upper Marlboro, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

KARWACKI, Judge.

The issue in this case is whether the Maryland Health Care Malpractice Claims statute, Maryland Code (1974, 1984 Repl.Vol., 1987 Cum.Supp.), §§ 3–2A–01, *et seq.*, of the Courts and Judicial Proceedings Article ("the Act") requires, as a condition precedent to a civil action in court, arbitration of a claim for damages against a pharmacist for errors in connection with the dispensing of a prescribed drug.

The alleged facts giving rise to this case are set forth in a complaint filed in the Circuit Court for Baltimore City on December 4, 1987 by the appellant, Margaret Mancuso. In that complaint, Mancuso alleges that on September 22, 1986, she purchased a prescription drug at a pharmacy owned and operated by the appellee, Giant Foods, Inc.

("Giant"). The prescription was for a drug named "Corgard" (a beta blocker) to control her pulse rate and blood pressure. Mancuso claims that instead of receiving Corgard, Giant filled the prescription with Chlorpropamide (a generic form of diabinese), a drug used to treat diabetes.[1] She relates that after taking the Chlorpropamide she went into a diabetic coma and suffered a serious and life-threatening injury. Mancuso alleges negligence, breach of warranties, and strict liability on the part of Giant because its employees failed to fill her physician's prescription properly.

Prior to trial on the merits, the trial court granted Giant's motion to dismiss Mancuso's claim on the ground that Mancuso had failed to comply with the mandatory arbitration provisions of the Act before instituting a suit in court. Judgment was entered in favor of Giant for costs. Discontented with the circuit court's decision, Mancuso filed a Motion to Revise Judgment or in the Alternative for a Stay pending arbitration. After a hearing on July 29, 1991, the trial court denied Mancuso's motion. Mancuso appealed to the Court of Special Appeals, and we issued a writ of certiorari before the matter was considered by the intermediate appellate court. Mancuso asks:

1. Did the trial court err in ruling that claims against pharmacists are subject to the mandatory arbitration provisions of the Health Care Malpractice Claims Act?

2. Did the trial court err in denying Mancuso's Motion to Revise Judgment to allow a Stay of the circuit court's proceedings pending the outcome of arbitration?

## I.

The question of whether claims against pharmacists for errors in dispensing prescribed drugs are subject to the mandatory arbitration provisions in the Act is essentially an

---

1. Pills of Chlorpropamide and Corgard are similar in size, shape, and color.

issue of statutory construction. We recently reviewed the rules of statutory construction in *Motor Vehicle Admin. v. Seidel*, 326 Md. 237, 248–49, 604 A.2d 473, 479 (1992), quoting *Morris v. Prince George's County*, 319 Md. 597, 603–04, 573 A.2d 1346, 1349 (1990) (citations and footnote omitted):

"There is no doubt that the beginning point of statutory construction is the language of the statute itself. Obviously, ' "what the legislature has written in an effort to achieve a goal is a natural ingredient of analysis to determine that goal." ' When we look at the statutory language, we attempt to give effect to all the words in the statute. And sometimes it may not be necessary to go further than the scrutiny of the statutory language, for the language itself may be sufficiently expressive of the legislative purpose or goal.

"But our endeavor is always to seek out the legislative purpose, the general aim or policy, the ends to be accomplished, the evils to be redressed by a particular enactment. In the conduct of that enterprise, we are not limited to the study of the statutory language. The plain meaning rule ' "is not a complete, all-sufficient rule for ascertaining a legislative intention...." ' The 'meaning of the plainest language' is controlled by the context in which it appears. Thus, we always are free to look at the context within which statutory language appears. Even when the words of a statute carry a definite meaning, we are not 'precluded from consulting legislative history as part of the process of determining the legislative purpose or goal' of the law."

(citations and footnote omitted).

Section 3–2A–02 of the Act provides:

"(1) all claims, suits, and actions ... by a person *against a health care provider for medical injury* allegedly suffered by the person in which damages of more than the limit of the concurrent jurisdiction of the District Court are sought are subject to and shall be governed by the provisions of [the Act].

(2) An action or suit of that type may not be brought or pursued in any court of this State except in accordance with this [Act] ..."

(emphasis added). The critical terms in § 3–2A–02, "health care provider" and "medical injury," are defined in § 3–2A–01 of the Act. At the time Mancuso filed this action, subsection 3–2A–01(e) defined a "health care provider" as:

"a hospital, a related institution as defined in § 19–301 of the Health–General Article, a physician, an osteopath, an optometrist, a chiropractor, a registered or licensed practical nurse, a dentist, a podiatrist, and a physical therapist, licensed or authorized to provide one or more health care services in Maryland. 'Health care provider' does not mean any nursing institution conducted by and for those who rely upon treatment by spiritual means through prayer alone in accordance with the tenets and practices of a recognized church or religious denomination."

Subsection 3–2A–01(f) defined "medical injury" as:

"injury arising or resulting from the rendering or failure to render health care."

Mancuso contends that it is clear from the statutory language contained in § 3–2A–01(e) that the Legislature did not include pharmacists as health care providers, and therefore did not intend that pharmacists be subject to the mandatory arbitration provisions of the Act. She submits that the statutory list of those professionals deemed to be health care providers is an exhaustive, as opposed to illustrative, list. In support of this contention, Mancuso highlights the Legislature's amendments to § 3–2A–01(e) in 1990, which added two professions to the list of those deemed to be health care providers.[2] She argues that if the Legislature had intended the statutory list in § 3–2A–01(e) to be merely illustrative, it would not have been necessary

---

2. *See* Ch. 357 of the Acts of 1990 (adding psychologists and licensed certified social workers to definition of "health care provider").

for the Legislature to add two more professions. Finally, with respect to whether her injury was a "medical injury," Mancuso contends that the filling of a prescription and/or the labeling of the drug dispensed does not constitute the "rendering of health care," but, rather, is the sale of a product. Therefore, she argues that the trial court committed reversible error when it granted Giant's motion to dismiss her complaint.

Giant, on the other hand, maintains that the analysis of whether a claim is subject to mandatory arbitration provisions of the Act does not end after determining whether the defendant satisfies the black letter definition of a health care provider in § 3–2A–01(e). It contends that this Court's decisions in *Group Health Ass'n v. Blumenthal*, 295 Md. 104, 453 A.2d 1198 (1983), and *Miles Laboratories v. Doe*, 315 Md. 704, 556 A.2d 1107 (1989) reflect that our analysis in cases such as the instant one is to look beyond the statutory definition of a health care provider to the nature of the plaintiff's claim, which necessarily includes analyzing the defendant's services. Giant submits that, in the case *sub judice*, the nature of Mancuso's claim is one sounding in medical malpractice, and that the services provided by pharmacists are akin to those of a professional who provides health care. In support of its contention that pharmacists are professionals who provide health care, Giant relies primarily on: 1) the General Assembly's regulation of pharmacists in the Health Occupations Article of the Md.Code; and 2) several out-of-state cases in which courts have commented on pharmacists and their role in advising customers regarding health care.[3]

## II.

At the outset, we believe that Giant misconstrues our holdings in both *Blumenthal, supra,* 295 Md. 104, 453 A.2d

---

**3.** *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 766–67, 96 S.Ct. 1817, 1828, 48 L.Ed.2d 346, 361 (1976); *Murphy v. E.R. Squibb & Sons, Inc.,* 40 Cal.3d 672, 678–79, 710 P.2d 247, 251, 221 Cal.Rptr. 447, 451 (1985).

1198, and *Miles Laboratories, supra,* 315 Md. 704, 556 A.2d 1107. In *Blumenthal,* the plaintiffs sued a Health Maintenance Organization ("HMO") for the alleged malpractice of a physician employed by that HMO. Among the issues certified to this Court by the United States District Court for the District of Maryland were: 1) whether the HMO was a "health care provider" under the Act so that the action against it for alleged malpractice was subject to mandatory arbitration, and 2) if not, was the plaintiff's claim seeking to hold the HMO liable on a *respondeat superior* theory for alleged malpractice of "health care providers" in its employ nevertheless subject to the mandatory arbitration provisions of the Act. *Blumenthal, supra,* 295 Md. at 109, 453 A.2d at 1202.

With respect to the first question, we determined that the HMO was not a health care provider because it was neither "a hospital" nor "a related institution as defined in § 19–301 of the Health–General Article" under § 3–2A–01(e). *Blumenthal, supra,* 295 Md. at 110, 453 A.2d at 1203. In reaching this decision, we examined the statutory list of professions set forth in § 3–2A–01(e) and determined that HMOs were neither expressly listed, nor included under those professions listed. We did not, as Giant suggests, look beyond the statutory language to the nature of the plaintiff's claim or the defendant's services in an attempt to determine whether a HMO was a health care provider within the contemplation of the Act. Instead, we found that the statutory language itself was sufficiently expressive to hold that HMOs were not subject to the Act's mandatory arbitration provisions.

We did, however, look to the nature of the plaintiff's complaint in addressing the second issue of whether claims against the defendant based on a *respondeat superior* theory were subject to the mandatory arbitration provisions of the Act. With respect to this issue, we concluded that the language in § 3–2A–02:

"[wa]s sufficient to encompass a claim against a health care provider which also forms the basis for *respondeat*

*superior* liability on the part of the health care provider's employer, whether or not that employer is itself a health care provider."

*Id.* at 112, 453 A.2d at 1203. In reaching this conclusion, we reasoned: 1) that the word "claim" in § 3–2A–02 is broader than the defendant named in the complaint; 2) that the plaintiff's complaint against the HMO was based solely on the HMO's vicarious liability for its employee-physician; and 3) that physicians are expressly listed under § 3–2A–01(e) as health care providers. Therefore, we held that the plaintiff's claim against the HMO was subject to the mandatory arbitration provisions of the Act. *Id.* at 111–14, 453 A.2d at 1203–04.

In *Miles Laboratories, supra,* 315 Md. 704, 556 A.2d 1107, the plaintiff was infected with the AIDS virus after receiving a transfusion of blood supplied by the American Red Cross ("the Red Cross"). In his complaint, the plaintiff alleged, *inter alia,* negligence, breach of implied warranties, and strict liability on the part of the Red Cross in supplying the contaminated blood. *Id.* at 735, 556 A.2d at 1123. One of the questions presented to this Court was whether claims of negligence or product liability against a blood supplier were subject to the mandatory arbitration provisions of the Act. *Id.* at 739, 556 A.2d at 1125. The Red Cross contended that injury suffered by the plaintiff constituted a "medical injury" under the Act, and that it was a "health care provider" under the statute, even though the statutory definition in § 3–2A–01(e) did not expressly include blood suppliers. After examining the language in § 3–2A–01(e), we determined that blood suppliers were not health care providers and that the alleged injury was not a medical injury within the ambit of the Act's provisions. *Id.* at 741, 556 A.2d at 1125. Again, we reasoned that blood suppliers were not health care providers because they were not included in the list of occupations set forth in § 3–2A–01(e). We did not look beyond the statutory definition of health care provider to the nature of the plaintiff's claim in reaching our decision.

In the case *sub judice,* we are likewise convinced that the unambiguous statutory language of § 3–2A–01(e) reveals that the Legislature did not intend that pharmacists be included as health care providers subject to the mandatory arbitration provisions of the Act. Pharmacists are not physicians, osteopaths, optometrists, chiropractors, registered or licensed practical nurses, dentists, podiatrists, or physical therapists, nor is a pharmacy a hospital or a "related institution as defined in § 19–301 of the Health–General Article." [4] Furthermore, we agree with Mancuso that the Legislature's recent amendment to the definition of "health care provider," in which two professions were added, evidences the Legislature's intention that the list of occupations set forth in § 3–2A–01(e) is exhaustive rather than illustrative.[5] We therefore hold that under the plain meaning of the statute pharmacists are not subject to the mandatory arbitration provisions of the Act and that it was error for the trial court to grant Giant's motion to dismiss Mancuso's complaint. *Accord Weidig v. Crites,* 323 Md. 408, 593 A.2d 1094 (1991); *Miles Laboratories, supra,* 315 Md. at 741, 556 A.2d at 1125; *Cannon v. McKen,* 296 Md. 27, 32–37, 459 A.2d 196, 199–201 (1983); *Blumenthal,* supra, 295 Md. at 110, 453 A.2d at 1202–03.[6]

---

**4.** At the time Mancuso filed her complaint, "related institution" was defined in pertinent part as:
> "an organized institution, environment, or home that:
>   (i) Maintains conditions or facilities and equipment to provide domiciliary, personal, or nursing care for 2 or more unrelated individuals who are dependent on the administrator, operator, or proprietor for nursing care or the subsistence of daily living in a safe, sanitary, and healthful environment;  and
>   (ii) Admits or retains the individuals for overnight care."
Md.Code (1982, 1987 Repl.Vol.), § 19–301(*l*)(1) of the Health–General Article.

**5.** Our review of the history of the Legislature's proposed amendments to § 3–2A–01 also reveals that no member of the General Assembly has ever proposed amending the list of professions to include pharmacists as "health care providers."

**6.** In light of our holding that the trial court erred in granting Giant's motion to dismiss Mancuso's complaint, we need not address the

JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS; COSTS TO BE PAID BY APPELLEE.

---

second issue presented as to whether the trial court abused its discretion in failing to revise its judgment to allow a stay of proceedings pending the outcome of arbitration.