REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1412

September Term, 2014

---

DANA RUSSELL STALLARD

v.

STATE OF MARYLAND

---

Meredith,
Berger,
Thieme, Raymond G., Jr.,
    Retired, Specially Assigned,

JJ.

---

Opinion by Thieme, J.

---

Filed: October 28, 2015

Following a bench trial in the Circuit Court for Garrett County, Dana Russell Stallard, appellant, was convicted of manufacturing methamphetamine, possession of plastic bottles adapted for the production of methamphetamine, possession of methamphetamine, possession of marijuana, and possession of drug paraphernalia. He was sentenced to five years' imprisonment for manufacturing methamphetamine, a consecutive two-year term for possession of plastic bottles adapted for the production of methamphetamine, and a consecutive four-year term for possession of methamphetamine. He was fined $500 for possession of marijuana and fined $500 for possession of drug paraphernalia.

Stallard appealed and presents two questions for our review, which we quote:

1.    Was the evidence insufficient to sustain Mr. Stallard's convictions for manufacturing methamphetamine and for possession of plastic bottles adapted for the production of methamphetamine?

2.    Is Mr. Stallard entitled to merger of the convictions and sentences for manufacturing methamphetamine and for possession of plastic bottles adapted for the production of methamphetamine?

For the reasons to be discussed, we conclude that Stallard's conviction for possession of plastic bottles adapted for the production of methamphetamine should have merged, for sentencing purposes, with the conviction for manufacturing methamphetamine. We otherwise affirm the judgment.

## BACKGROUND

On November 14, 2013, police officers assigned to the Garrett County Narcotics Task Force executed a search and seizure warrant at Stallard's residence located on Morris Avenue in Friendsville. Maryland State Police Trooper Sid Bittinger testified that, when the

warrant was executed about 9:56 a.m., Stallard, a woman, and a child were home at the residence. Prior to entering the premises, Trooper Bittinger asked Stallard whether there was "any methamphetamine cooking inside the residence." Stallard responded that there was a "bottle underneath the kitchen table" and he advised the officer not to "tighten the lid on it" or it "might blow up and catch the house on fire."

The search of the premises revealed a number of items, including two plastic bottles containing a "white powder" substance; a pipe believed to be a "marijuana smoking device"; a pouch with various items (tweezers, a spoon, a "pen body," a hypodermic syringe, and "suboxone strip") containing suspected methamphetamine; a Coleman fuel container; a Red Devil lye container; several "aluminum foil homemade smoking pipes"; a "silver metal grinder" which appeared to contain marijuana residue; "cold packs"; a "red plastic grinder"; a clear plastic bottle inside a plastic cup containing a liquid resembling "separated oil and water"; a clear plastic bottle "with a liquid inside, along with black lithium battery strips"; a bottle with a "muriatic acid" label; and a bottle of Claritin brand pills.

Trooper Bittinger testified about a conversation he had with Stallard just after the search was completed in which Stallard related that he had "learned to cook methamphetamine" two or three weeks previously. Stallard then went on to describe the process. He related that he had purchased the necessary items, including fuel oil, lye, lithium batteries, and Claritin pills (which may contain pseudoephedrine – an ingredient used in the manufacture of methamphetamine). Stallard explained that he used the "cold cook method"

2

to manufacture the methamphetamine, which involved putting two cupfuls of lye, crushed Claritin pills, three-quarters of a cold pack containing nitrate, and some Coleman fuel into "plastic bottles." He then removed the lithium strips from the batteries and added them to the mixture. Afterwards he shook the bottle until it swelled and then he "slowly let the air out" over a "one-hour time period." At this stage, Stallard related that it was "very easy for the bottle to blow up or to catch on fire." Once this phase was completed, Stallard said that he would filter what remained in the bottle into a mason jar. He would then pour the liquid into a second bottle and add distilled water and muriatic acid. After that he would shake the bottle and turn it upside down and slowly loosen the cap. He would then "squeeze out the oil onto a special plate" and place the plate on a hot stove and let the liquid evaporate. The end result of the process was approximately six grams of methamphetamine.

Trooper Bittinger further testified that Stallard informed him that he injected the methamphetamine and also smoked it. Stallard knew it was dangerous to cook, but he said he was so addicted he could not stop.

Eileen Briley, a forensic examiner and chemist with the Maryland State Police, testified that she examined and tested some of the items recovered from Stallard's home. She found residue of methamphetamine on (or in) various objects, including the pen body, metal spoon, tweezers, pouch, aluminum foil smoking device, and a straw. A bag containing plant material contained marijuana and marijuana residue was found on the metal grinder and in a smoking device.

3

Maryland State Trooper Pennie Kyle, an expert in the identification of methamphetamine and its production and manufacture, testified that the evidence recovered from Stallard's home indicated that Stallard was involved in "a one-pot or a shake-and-bake type method of cooking methamphetamine." This "easy" method required "three main ingredients," ephedrine or pseudoephedrine, "some type of anhydrous ammonia" (such as that found in cold packs and mixed with lye), and "some kind of lithium metal" (such as that found in some batteries), as well as a solvent (with Coleman fuel being the most common one used). Trooper Kyle then explained the "cooking" process in some detail and further testified that the items found in Stallard's home were consistent with the manufacture of methamphetamine.

As noted, the court found Stallard guilty of manufacturing methamphetamine, possession of plastic bottles adapted for the production of methamphetamine, possession of methamphetamine, possession of marijuana, and possession of drug paraphernalia.

## DISCUSSION

## I.

### *Sufficiency of the Evidence*

#### *A. Manufacture of Methamphetamine*

Stallard asserts that the evidence was insufficient to convict him of manufacturing methamphetamine because the evidence established that he was "cooking" the substance for

his personal use and, under the statute, the manufacture of a controlled dangerous substance

("CDS") for personal use is not a crime.[1]

The issue is less one of sufficiency of the evidence, and more a question of statutory

interpretation.  Section 5-603 of the Criminal Law Article of the Maryland Code (2012 Repl.

Vol.) provides:

> Except as otherwise provided in this title, **a person may not manufacture a controlled dangerous substance**, or manufacture, distribute, or possess a machine, equipment, instrument, implement, device, or a combination of them that is adapted to produce a controlled dangerous substance under circumstances that reasonably indicate an intent to use it to produce, sell, or dispense a controlled dangerous substance in violation of this title.

(Emphasis added.)

The term "manufacture" is used in various provisions throughout Title 5 ("Controlled

Dangerous Substances, Prescriptions, And Other Substances") of the Criminal Law Article,

and is defined as follows:

> (1) "Manufacture," with respect to a controlled dangerous substance, **means to produce, prepare, propagate, compound, convert, or process a controlled dangerous substance**:
>    (i)   directly or indirectly by extraction from substances of natural origin;
>    (ii)  independently by chemical synthesis; or
>    (iii) by a combination of extraction and chemical synthesis.
> (2) "Manufacture" includes to package and repackage a controlled dangerous substance and label and relabel its containers.
> (3) "**Manufacture" does not include:**

---

[1] We use the terms "controlled dangerous substance(s)" and "CDS" interchangeably in this opinion.

**(i) to prepare or compound a controlled dangerous substance by an individual for the individual's own use**; or

(ii) to prepare, compound, package, or label a controlled dangerous substance:

1. by an authorized provider incidental to administering or dispensing a controlled dangerous substance in the course of professional practice; or

2. if the controlled dangerous substance is not for sale by an authorized provider, or by the authorized provider's agent under the authorized provider's supervision, for or incidental to research, teaching, or chemical analysis.

Crim. Law, § 5-101(p) (emphasis added).

Stallard maintains that the so called "personal use exception" in the definition of manufacture "required the State to prove that the intent to manufacture methamphetamine was not for [his] personal use." He claims, however, that "the undisputed evidence was that [he] was 'cooking' the purported methamphetamine for his own personal use" and there "was absolutely no suggestion of any intent to distribute the drug."

The State asserts that "the personal use exception is limited to the preparation or compounding of a controlled dangerous substance by an individual for the individual's own use" and, as such, it does not encompass the "production, propagation, conversion, or processing" of a controlled dangerous substance for personal use. The State therefore maintains that, because "the personal use exception does not apply to the *production* of a controlled dangerous substance, the exception does not apply to Stallard's conduct." (Emphasis added.) "Given the dangers inherent in the manufacture or production of methamphetamine," the State continues that "it would be absurd for the legislature to

6

exclude from its definition of manufacture the production of methamphetamine simply because it was for personal use."

We are unaware of any reported Maryland case addressing this issue. Accordingly, we turn to the often-cited rules of statutory interpretation, which the Court of Appeals has summarized as follows:

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to the legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with forced or subtle interpretations that limit or extend its application.
>
> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope. Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose and relative rationality and legal effect of various competing constructions.

7

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense.

*Gardner v. State*, 420 Md. 1, 8-9 (2011) (quoting *State v. Johnson*, 415 Md. 413, 421–422 (2010)) (internal quotation marks and citations omitted).

Title 5 of the Criminal Law Article was enacted for the following purpose:

(a) *Findings*. – The General Assembly finds that:
(1) many of the substances listed in this title have a useful and legitimate medical purpose and are necessary to maintain the health and general welfare of the people of the State; but
(2) the illegal manufacture, distribution, possession, and administration of controlled dangerous substances have a substantial and detrimental effect on the health and general welfare of the people of the State.
(b) *Purpose.* – (1) The purpose of this title is to establish a uniform law to control the manufacture, distribution, possession, and administration of controlled dangerous substances and related paraphernalia to:
(i) ensure their availability for legitimate medical and scientific purposes; but
(ii) prevent their abuse, which results in a serious health problem to the individual and represents a serious danger to the welfare of the people of the State.
(2) **This title shall be liberally construed to accomplish this purpose.**

Crim. Law, § 5-102 (emphasis added).

To implement the purposes stated above, the General Assembly enacted a statutory scheme which involved the registration and regulation of legitimate manufacturers, distributors, and dispensers of CDS and criminalized certain activities involving the unregistered or illicit manufacture, possession, and distribution of CDS. *See* Crim. Law, § § 5-301 et seq. Accordingly, unless authorized by statute, it is a crime to possess or administer a controlled dangerous substance, Crim. Law, § 5-601; to distribute or dispense

8

a controlled dangerous substance or possess it in a sufficient quantity to indicate under all circumstances an intent to distribute or dispense it, Crim. Law, § 5-602; and to manufacture a controlled dangerous substance, Crim. Law, § 5-603.

As noted, Stallard does not dispute that he was "cooking" a combination of substances for the purpose of creating methamphetamine. Nor does he dispute that methamphetamine is a controlled dangerous substance. But he maintains that because he was making it for his personal use it was not a criminal offense under Crim. Law, § 5-603. We disagree.

By statutory definition, "manufacture" "means to produce, prepare, propagate, compound, convert, or process a controlled dangerous substance." But the term "does not include to prepare or compound a controlled dangerous substance by an individual for the individual's own use[.]" Crim. Law, 5-101(p)(3). Thus, by its plain and unambiguous language, the personal use exception applies only when someone prepares (gets ready) or compounds (mixes) a CDS for his or her own use, but not when a person produces, propagates, converts, or processes a CDS. *Leppo v. State Highway Administration*, 330 Md. 416, 423 (1993) ("'Where a statute expressly provides for certain exclusions, others should not be inserted.'") (quoting *Pennsylvania National Mutual v. Gartelman*, 288 Md. 151, 156 (1980)).

The next question is whether Stallard was producing, propagating, converting, or processing methamphetamine, activities which do not fall within the "personal use

9

exception." "'Produce,'with respect to a controlled dangerous substance, *includes* to manufacture, plant, cultivate, grow, and harvest." Crim. Law, § 5-101(w) (emphasis added).[2] As the Court of Appeals has observed, when used in a statute, the term "includes" has "various shades of meaning, and its interpretation 'depends upon the context' in which the term is used." *Liverpool v. Baltimore Diamond Exchange, Inc.*, 369 Md. 304, 321 (2002) (quoting *Housing Authority of Baltimore City v. Bennett*, 359 Md. 356, 372 (2000)). "'Ordinarily, the word 'include[s]' means comprising by illustration [of a general term] and not by way of limitation.'" *Id*. (quoting *Group Health Ass'n v. Blumenthal*, 295 Md. 104, 111 (1983)).

It is clear here that, by using the word "includes" (instead of "means") to define "produce," the legislature did not intend to limit what it means to produce a CDS, but rather gave examples of various ways a CDS can be created, that is, by manufacturing, planting, cultivating, growing, and harvesting. In its ordinary sense, the verb "produce" means "to bring into existence; to create," *Black's Law Dictionary* (10th ed. 2014), and the legislature did not indicate any intention to restrict or alter the ordinary meaning of "produce" when it used the term. Accordingly, we hold that it is unlawful under Crim. Law, § 5-603 to

---

[2] The legislature did not define the other terms associated with "manufacture," namely, "prepare, propagate, compound, convert, or process." "Produce," however, seems to be the term which best describes the activities Stallard was engaged in when he was "cooking" or making methamphetamine.

10

produce or make methamphetamine, even if it is done by an individual for the individual's own personal use.

Again we note that Stallard does not dispute that he was making methamphetamine. He even explained to Trooper Bittinger the ingredients he purchased and the various steps he took to create the substance. And Trooper Kyle testified that the items found in Stallard's home were indicative of a known method of manufacturing methamphetamine. Accordingly, we hold that there was sufficient evidence from which any rational trier of fact could have concluded, beyond a reasonable doubt, that Stallard was guilty of manufacturing methamphetamine.

### B. Possession of Plastic Bottles Adapted for the Production of Methamphetamine

In addition to charging Stallard with manufacturing methamphetamine, the State also charged that he had unlawfully possessed "plastic bottles" adapted for the production of methamphetamine under circumstances that reasonably indicated an intent to use them to produce the CDS, an offense also prohibited by Crim. Law, § 5-603.[3]

---

[3] Count 3 of the criminal information read, in pertinent part, that Stallard:

> . . . on or about the 14th day of November, 2013, in Garrett County, Maryland, did unlawfully possess plastic bottles adopted [sic] for the production of a controlled dangerous substance of Schedule II, to wit: Methamphetamine, under circumstances reasonably indicating an intention to use same to produce such controlled dangerous substance, in violation of Article CR, Section 5.603 of the Annotated Code of Maryland[.]

11

Except as otherwise provided in this title, **a person may not** manufacture a controlled dangerous substance, or manufacture, distribute, or **possess a machine, equipment, instrument, implement, device, or a combination of them that is adapted to produce a controlled dangerous substance under circumstances that reasonably indicate an intent to use it to produce**, sell, or dispense **a controlled dangerous substance** in violation of this title.

Crim. Law, § 5-603 (emphasis added).

Stallard asserts that the evidence was insufficient to convict him of this crime because "the undisputed evidence established *only* that [he] was 'cooking' methamphetamine for his own personal use and the State made no attempt to prove that [he] possessed production equipment 'under circumstances that reasonably indicate an intent to use it to produce, sell, or dispense' the drug." He stresses that there was "absolutely no suggestion of any intent to distribute the drug" and that, other than residue found on various items, "no quantities of methamphetamine" nor cash were found in his apartment.

The State responds that, by emphasizing the lack of evidence of an intent to distribute, Stallard is ignoring words in the statute that clearly reflect that a person may commit the offense by possessing equipment "that is adapted to produce a controlled dangerous substance under circumstances that reasonably indicate an intent to use it to **produce**" (or sell or dispense) a controlled dangerous substance. (Emphasis added.) We agree with the State that, the adaptation of equipment or an instrument or a device, such as a plastic bottle, for use in making methamphetamine is a crime under Crim. Law, § 5-603 where the circumstances reasonably indicate an intent to use the item to produce methamphetamine.

12

The State also maintains that it adduced sufficient evidence to reasonably indicate that Stallard adapted the plastic bottles for use in his production of methamphetamine. We agree. When the police arrived to execute the warrant, Stallard admitted that a plastic bottle under the kitchen table was then being used to produce methamphetamine and he warned them not to "tighten the lid on it" or it "might blow up." Two other plastic bottles were found that contained a substance which Trooper Kyle testified had the "color and consistency" of others that she had seen in "other confirmed methamphetamine labs" using the same "one-pot" cook method Stallard had used. And a fourth plastic bottle containing a liquid and oil substance was found positioned upside down over another container, which again was consistent with the method of producing methamphetamine that Stallard had described. In sum, there was sufficient evidence from which any rational trier of fact could have concluded, beyond a reasonable doubt, that Stallard was guilty of adapting plastic bottles for use in his production of methamphetamine.

## II.

### *Merger*

Stallard contends that his "convictions and sentences" for manufacturing methamphetamine and for possessing plastic bottles adapted to produce methamphetamine should have merged. Specifically, he asserts that the "possession of production equipment – the lesser offense – should have merged into manufacturing – the greater offense." Merger was required, Stallard maintains, if not under the required evidence test, then under the rule

13

of lenity or as a matter of fundamental fairness. He asserts that, under the circumstances here – where the plastic bottles were an "integral component" of the manufacturing process, an hence the manufacturing conviction – the legislature could not have intended "double punishment."

The State disagrees that the convictions should merge under any theory because "there were multiple bottles aside from the one being used to manufacture methamphetamine" when the warrant was executed. The State points out that, besides the bottle found underneath the table in which methamphetamine was being "cooked," two bottles were found on the back porch containing a "powder" and another bottle was found in the kitchen placed upside down in another container.[4] The State, therefore, maintains that "the two offenses did not grow out of the same act or transaction" and, as such, merger is not appropriate.

---

[4] There was no evidence at trial regarding any analysis of the powder-like substance in the two bottles found on the back porch, but Trooper Kyle testified that, based on her review of a photograph that was taken of the bottles, the substance had the "color and consistency" that she had seen "in other confirmed methamphetamine labs" using the "one-pot method" of "cooking" the drug.

Another bottle, found upside down in another plastic container, contained a substance resembling separated "liquid and oil." Apparently the substance was not analyzed, but Trooper Kyle testified that "this [was] something she had seen in other methamphetamine labs." She testified that, after the initial reaction of ingredients, "the liquid part" is poured off, leaving "two layers" – including an oily layer on the top (which contains the methamphetamine) and another liquid. The bottle is then "turned upside down" for purposes of draining the liquid and then extracting the methamphetamine from the oily substance. In fact, when explaining how he made methamphetamine to Trooper Bittinger, Stallard discussed the phase in which "he turned the bottle upside down" and then "squeezed out the oil."

14

"'The doctrine of merger of offenses for sentencing purposes is premised in part on the Double Jeopardy Clause of the Fifth Amendment of the U.S. Constitution, applicable to state court proceedings via the Fourteenth Amendment.'" *Jones-Harris v. State*, 179 Md. App. 72, 98 (quoting *Abeokuto v. State*, 391 Md. 289, 352-53 (2006)), *cert. denied*, 405 Md. 64 (2008). The Double Jeopardy Clause "provides the criminally accused with protection from, *inter alia*, multiple punishment stemming from the same offense." *Purnell v. State*, 375 Md. 678, 691 (2003).

The statute at issue here, Crim. Law, § 5-603, clearly prohibits both the manufacture of a CDS and the adaption of equipment to produce a CDS:

> Except as otherwise provided in this title, a person may not manufacture a controlled dangerous substance, or manufacture, distribute, **or** possess a machine, equipment, instrument, implement, device, or a combination of them that is adapted to produce a controlled dangerous substance under circumstances that reasonably indicate an intent to use it to produce, sell, or dispense a controlled dangerous substance in violation of this title.

Crim. Law, § 5-603 (emphasis added).

The penalty for violating this statute is found in Crim. Law, § 5-607 which provides that "a person who violates a provision of §§ 5-602 through 5-606 of this subtitle is guilty of a felony and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $15,000 or both." Repeat offenders may be subject to enhanced penalties. *See* Crim. Law, §§ 5-607 - 5-609.

Although we agree with the State that manufacturing methamphetamine and adapting devices for use in the manufacturing process would not merge under the "required evidence

15

test," because each offense requires proof of a fact which the other does not, we conclude that, in this case, they should merge under the rule of lenity.[5]  "'The "rule of lenity" is a principle of statutory construction' that 'amounts to an alternate basis for merger in cases where the required evidence test is not satisfied, and is applied to resolve ambiguity as to whether the Legislature intended multiple punishments for the same act or transaction.'" *Kyler v. State*, 218 Md. App. 196, 228 (quoting *Marlin v. State*, 192 Md. App. 134, 167 (2010)), *cert. denied*, 441 Md. 62 (2014).  The rule of lenity has been summarized as follows:

> "Two crimes created by legislative enactment may not be punished separately if the legislature intended the offenses to be punished by one sentence.  It is when we are uncertain whether the legislature intended one or more than one sentence that we make use of an aid to statutory interpretation known as the 'rule of lenity.'  Under that rule, if we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we, in effect, give the defendant the benefit of the doubt and hold that the crimes do merge."

*Id*. (quoting *Moore v. State*, 198 Md. App. 655, 686 (2011) (further citation omitted).

Both charges against Stallard – the manufacturing of methamphetamine and the adaption of plastic bottles used to produce it – were brought under the same statute based on the totality of the evidence recovered from his residence when the police executed the warrant on November 14, 2013.  Although it is true that multiple plastic bottles were found

---

[5] "The required evidence test focuses upon the elements of each offense; if all the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter." *Kyler v. State*, 218 Md. App. 196, 225-26 (quotations omitted), *cert. denied*, 441 Md. 62 (2014).

16

when the warrant was executed, the evidence at trial was that all of the bottles were used in some phase of Stallard's multi-step production of methamphetamine. The statute is not clear whether, under such circumstances, the legislature intended separate sentences be imposed for manufacturing a CDS and adapting items for use in that same manufacturing process. Because of this uncertainty, the benefit of the doubt is resolved in Stallard's favor. Accordingly, for sentencing purposes, Stallard's conviction for adapting plastic bottles for use in the production of methamphetamine should have merged with his conviction for manufacturing methamphetamine.

**TWO-YEAR SENTENCE FOR POSSESSION OF PLASTIC BOTTLES ADAPTED FOR THE PRODUCTION OF METHAMPHETAMINE VACATED. JUDGMENT OF THE CIRCUIT COURT FOR GARRETT COUNTY OTHERWISE AFFIRMED. COSTS TO BE SPLIT (50% EACH) BETWEEN APPELLANT AND GARRETT COUNTY.**

17